**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

BAYS EXPLORATION, INC., a Texas )
  corporation; BAYS ENERGY PARTNERS )
  2007 L.P., a Texas limited partnership, )
                                                         )
      Plaintiffs, )
                                                         )
vs. ) NO. CIV-07-754-D
                                                         )
PENSA, INC., a Colorado corporation, )
                                                         )
      Defendant. )

**ORDER**

Before the Court is the Motion for Partial Summary Judgment [Doc. No. 190] of Plaintiff Bays Exploration, Inc. ("Bays")[1]. Defendant PenSa, Inc. ("PenSa") timely responded, and Bays filed a reply.

Background:

Bays brought this action to recover amounts allegedly due and owing by PenSa arising from the drilling and operation of several jointly owned oil and gas wells located in Oklahoma. Bays is the operator of certain jointly owned wells, and PenSa claims a non-operator/working interest in those wells. As more fully explained herein, Bays and PenSa executed letter agreements and joint operating agreements naming Bays the operator of the wells. In general, the joint operating agreements contain provisions governing the contracting parties' interests and the responsibilities, rights, and duties of the operator and non-operators; the agreements also contain provisions controlling the drilling and development of the subject wells. With respect to their drilling and

---

[1] Plaintiff Bays Energy Partners 2007, L.P., has also filed a partial summary judgment motion; that motion is addressed in a separate order.

exploration activities for the wells, Bays and PenSa also executed a letter agreement known as an Area of Mutual Interest Letter Agreement, which also prescribes certain rights and obligations of the contracting parties.

Pursuant to these agreements, Bays began drilling and operating several wells. Ultimately, disputes developed between Bays and PenSa regarding their respective rights and obligations. As more specifically explained herein, Bays contends PenSa failed to timely elect to participate in certain wells, thereby relinquishing its interests in those wells; PenSa argues its elections were timely and/or any delayed election is excused by the parties' agreements or Bays's improper conduct. In addition, PenSa failed to pay certain joint interest billings on wells in which it elected to participate; it contends payment was excused for various reasons including, *inter alia*, improper or excessive charges and Bays's failure to fulfill its obligations under the agreements. PenSa also challenged the propriety of Bays's sale of its interests in the jointly owned wells and properties to Plaintiff Bays Energy Partners 2007, L.P. ("Bays Energy Partners").

Bays and Bays Energy Partners filed this lawsuit asserting ten claims for relief; in its counterclaims, PenSa asserts fifteen claims for relief. The claims and counterclaims involve two general topics: 1) Bays's operation of the jointly owned wells and properties; and 2) the effect of Bays's sale of its interests in the jointly owned wells and properties to Bays Energy Partners. In its motion, Bays seeks partial summary judgment only with respect to some of the claims and counterclaims related to the first category. In general, its claims in that category[2] assert a breach of contract based on PenSa's failure to pay amounts represented by some joint interest billings and

---

[2] The parties' claims and counterclaims are alleged in considerable factual detail, and this summary is not intended to repeat their specific allegations; instead, it is designed to generally describe the nature of their dispute regarding their respective roles as operator and non-operating working interest owner in the subject wells.

2

seek declaratory judgments regarding the legal consequences of PenSa's actions or inactions as a non-operator of specific wells. Bays also seeks foreclosure of an operator's lien regarding certain properties. PenSa's counterclaims related to the first topic include claims that Bays breached its obligations as operator in numerous specific ways. It also seeks declaratory judgments that PenSa's failure to elect to participate in certain wells and its failure to pay some joint interest billings was proper and/or warranted by Bays's allegedly improper conduct. PenSa also seeks an accounting by Bays as well as an order directing Bays to provide PenSa with certain well and seismic information. PenSa further alleges that Bays breached both a fiduciary duty and a duty of good faith and fair dealing, and seeks damages attributable to such breaches. In addition, PenSa asserts a quiet title claim to certain properties and seeks removal of Bays as operator.

In its motion for partial summary judgment, Bays does not seek judgment on all claims asserted against PenSa; instead, its motion is limited to the following specific contentions:

1) PenSa's election to participate in the Konlee Jae No. 2-35 a/k/a Joey No. 1-35 Well was not timely and resulted in PenSa's classification as "non-consent" under the applicable Joint Operating Agreement ("JOA");

2) PenSa affirmatively elected not to participate in the Brinlee Ann Marie No. 1-26 Well, thereby relinquishing its rights in that well, and it is not entitled to make a retroactive election to participate;

3) PenSa failed to respond to Bays's well proposals for three wells – the Wildhorse No. 1-26, the Sandra Kay No. 1-26, and the Maria No. 1-26, thereby relinquishing its right to participate in those wells, and it is not entitled to retroactively elect to participate;

4) PenSa failed to pay its proportionate share of the joint interest billings for wells in which

3

it did participate, and that failure constitutes a breach of contract and an event of default under the JOAs;

  5) Bays was entitled to suspend PenSa's rights as a result of the foregoing alleged defaults;

  6) Bays has a valid and enforceable operator's lien which is superior to any right, title, or interest of PenSa in the subject wells and properties;

  7) PenSa cannot, as a matter of law, recover on its counterclaim based on breach of fiduciary duty because Oklahoma does not recognize such a duty under these facts; and

  8) PenSa cannot, as a matter of law, recover on its counterclaim of breach of a duty of good faith and fair dealing because Oklahoma does not recognize such a duty under these facts.

In response to the motion for partial summary judgment, PenSa argues that Bays is not entitled to judgment on any of these contentions. It asserts that there are material factual disputes precluding summary judgment.

Summary judgment standards:

Summary judgment is proper where the undisputed material facts establish that a party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c)*; Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A material fact is one which may affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). To dispute a material fact, the non-moving party must offer more than a "mere scintilla" of evidence; the evidence must be such that "a reasonable jury could return a verdict" in its favor. *Id.* "[T]he requirement that a dispute be 'genuine' means simply that there must be more than 'some metaphysical doubt as to the material facts.'" *Anderson*, 477 U.S. at 260-261(quoting *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The facts and reasonable inferences therefrom must be viewed

in the light most favorable to the non-moving party. *MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1273 (10th Cir. 2005).

If the undisputed facts establish that a party cannot prove an essential element of a cause of action, the movant is entitled to judgment on that cause of action. *Celotex*, 477 U.S. at 322. However, a party seeking summary judgment need not disprove the opposing party's claim; it must only point to "a lack of evidence" on an essential element of that claim. *United States v. AMR Corp.*, 335 F. 3d 1109, 1113 (10th Cir. 2003); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). The burden then shifts to the claimant to go beyond the pleadings and present facts, admissible in evidence, from which a rational trier of fact could find in its favor; conclusory arguments are insufficient, as the facts must be supported by affidavits, deposition transcripts, or specific exhibits incorporated therein, and it is not the Court's responsibility to attempt to find evidence in the record which could support a claimant's position. *Adler,* 144 F. 3d at 671-72.

<u>The record before the Court:</u>

The parties' briefs include an extensive discussion of the facts underlying this action and the application of Oklahoma law, which the parties agree governs this dispute, to those facts. The parties have also submitted a voluminous record containing extensive documents for the Court's review. In support of its motion, Bays lists numerous facts which it contends are undisputed. Although PenSa disputes some factual statements, numerous facts are expressly undisputed, and the parties' arguments focus primarily on the legal consequences of those facts.

The parties agree that, on or about April 12, 2005, they executed a letter agreement regarding oil and gas wells in an area known as the Treasure Valley North Prospect; the agreement was an Area of Mutual Interest Agreement ("Treasure Valley AMI agreement"). It was executed for the

purpose of acquiring oil and gas leasehold and mineral interests in certain lands located in Garvin County and Murray County, Oklahoma.

The Treasure Valley AMI agreement provides, in pertinent part, that Bays shall be the operator of the properties covered therein, that the oil and gas leases acquired are subject to a Model Form Operating Agreement, also known as a JOA, and that, in the event of a conflict between the Treasure Valley JOA and the Treasure Valley AMI agreement, the terms of the AMI agreement shall prevail. The Treasure Valley AMI agreement also provides that, following the drilling and completion of the initial test well, the first subsequent well in the prospect will not be commenced until 90 days after the date of first production in the initial test well, unless there is written approval of the parties to act otherwise.

In addition, the Treasure Valley AMI agreement provides that PenSa, as a non-operating party, must pay its share of the dry hole costs, along with any other outstanding costs that may have been previously billed under the terms of the agreement, concurrent with PenSa's election to participate in any proposed drilling operation. The Treasure Valley AMI agreement further provides that the "failure by a non-operator to make such payments within such thirty day period shall be deemed an election to relinquish 100% of such non-operator's interest in the well and the acreage within the geographical limits of the largest drilling and spacing units surrounding such proposed well." Treasure Valley AMI agreement, Bays Ex. 1, pp. 2-3. The Treasure Valley AMI agreement also states that "it is the intent of Bays and PenSa that no well will be proposed more than thirty days prior to the anticipated spud date." *Id.* at p. 2. PenSa interprets that language as having been intended to "prevent [Bays] from holding [PenSa's] money indefinitely" and "drawing interest on it" until it drilled the well. Bays Ex. 2.

6

On or about March 1, 2005, Bays and PenSa executed a JOA covering the properties included in the Treasure Valley AMI agreement; the JOA terms are those of the American Association of Petroleum Landmen Form 610-1989 Model Form Operating Agreement[3]; a copy of the JOA is submitted as Bays Exhibit 3. The JOA provides that any party may propose the drilling of additional wells subsequent to the initial well by issuing a written notice that describes the work to be performed for the new well, the location of the new well, the proposed depth of the new well, the objective zone, and the estimated cost of the operation. Bays Ex. 3, pp 5-6.

The parties agree that Bays drilled the initial test well, the Laticia Lee Well No. 1, in Garvin County, Oklahoma; PenSa elected to participate in the well. Although Bays contends it completed the Laticia Lee well on or about September 7, 2005 and production commenced in October of 2005, PenSa disputes that contention, stating the well produced for only about 13 days in October of 2005 and that it did not have sustained production until sometime in March or April of 2006.

The parties agree that, on April 21, 2006, Bays issued a letter proposing to drill the Brinlee Ann Marie No. 1 well in Garvin County, and PenSa declined to participate in that well. That well was spudded in November of 2006, completed in March, 2007, and has been capable of continuously producing hydrocarbons in paying quantities since its completion.

It is not disputed that PenSa elected to participate as a non-operator/working interest owner in eight wells in the Treasure Valley prospect: the Hallee Blair No. 1, Konlee Jae No. 1, Donna Sue No. 1, Ethel Lou No. 1, Dulaney No. 1, Anderson No. 1, El Ray No. 1, and Tammy No. 1, all located in Garvin County. In addition, PenSa participated in four Garvin County wells in the Golden Trend Prospect, to wit; the Wildman No. 1, Vicki Kay No. 1, R. C. Stephens No. 1, and J. A. Payne No.

---

[3] Subsequent JOAs executed by the parties also use this Model Form Operating Agreement.

7

1. Bays and PenSa executed additional JOAs, as amended by special provisions, for the R. C. Stephens No. 1 well, the Vicki Kay No. 1 well, the Wildman No. 1 well, and the J. A. Payne No. 1 well; in each of the JOAs, Bays is appointed the operator and PenSa a non-operator.  <u>Application: Timeliness of PenSa's elections:</u>

Bays contends the evidence establishes that PenSa either affirmatively elected not to participate or failed to timely elect participation in five wells: the Brinlee Ann Marie No. 1-26, Wildhorse No. 1-26, Sandra Kay No. 1-26, Maria No. 1-26, and Konlee Jae No. 2-35 (later renamed the Joey No. 1-35). As a result, it argues it is entitled to declaratory judgments that PenSa relinquished its rights to these wells.

PenSa does not dispute that it affirmatively elected not to participate in the Brinlee Ann Marie No. 1-26 well. According to the undisputed evidence before the Court, Bays provided its written well proposal for the Brinlee Ann Marie on April 21, 2006. Bays Ex. 6. PenSa does not dispute that it timely received that proposal; it admits that, on or about May 19, 2006, it submitted to Bays an "Election Not to Participate" in the well. Bays Ex. 7.

Pursuant to the applicable agreements executed by the parties, PenSa was required to notify Bays of its election regarding participation in the well within 30 days of its receipt of the well proposal; a failure to timely elect to participate results in the relinquishment of the non-consenting party's interest in the proposed well. Treasure Valley JOA, Bays Ex. 12, pp. 6-7. Bays argues that, under the undisputed facts, PenSa relinquished its interest in the Brinlee Ann Marie well when it elected not to participate during the required time period.

Notwithstanding its election not to participate in the Brinlee Ann Marie well, PenSa argues that it did not relinquish its interest in the well and should be entitled to receive proceeds. PenSa

8

asserts several contentions in support of its position. First, it argues that Bays did not timely "commence" well operations. According to Bays's interpretation of the parties' agreements, it had a total of 120 days from the date it submitted its April 21, 2006 well proposal, or until August 21, 2006, to commence well operations. This calculation is based on the 90-day time period in the parties' agreements, plus the 30-day period in which non-operators were required to elect whether to participate in the proposed well. Although PenSa contends this is incorrect, it nevertheless does not dispute Bays's contention that Bays was required to "commence operations" on or before August 19, 2006. Thus, PenSa's argument regarding calculation of the time period does not create a material factual dispute because the parties agree that the deadline was August 19, 2006.

PenSa next argues that its election to not participate does not relinquish its interest because Bays failed to "commence operations" on the well by the August 19 deadline. Although it concedes that Bays constructed the drilling location on June 13, 2006, it argues this is insufficient to constitute commencement of operations.

PenSa's contention is contrary to applicable law. "'[I]t is generally held that acts which are preparatory to drilling are sufficient to constitute the commencement of a well and that it is not essential that the lessee be in the process of making hole.'" *21st Century Inv. Co. v. Pine*, 734 P. 2d 834, 840 (Okla. Civ. App. 1986) (quoting 3 E. Kuntz, *A Treatise on the Law of Oil and Gas* § 32.3 at 70 (1967) ("Kuntz")). "'A lessee has commenced a well if he has conducted operations on the land in good faith preparation for the drilling of a well for oil or gas and has continued the operation in good faith and with diligence.'" *Id.* (quoting Kuntz § 32.3 at 69). Thus, preparatory operations such as building the drilling pad or even transporting the drilling rig to the location are considered sufficient to constitute commencement of operations. *21st Century*, 734 P. 2d at 840.

9

PenSa offers no authority to the contrary. Instead, it argues Bays did not commence operations because it did not act diligently or in good faith when it constructed the drilling location on June 13, 2006. According to PenSa, Bays did not set casing until September 15, 2006; it argues that, because there was no activity during the interim three months, Bays did not commence operations in good faith.

Whether the operator acted in good faith in commencing a well is determined by ascertaining if it began preparatory work with the intention of actually completing the well. "If he had no intention of completing a well, the preliminary work was not the commencement of a well as the final product; it would be the commencement of work toward an objective other than the drilling of a well." Kuntz § 32.3 at 69.

PenSa offers no evidence that Bays did not intend to complete the Brinlee Ann Marie well when it began preparatory work on June 13, 2006. Nor does it offer legal authority to support its contention that the delay in setting the casing constitutes bad faith or a lack of diligence. In fact, PenSa does not dispute that the well was spudded in November of 2006 and completed in March of 2007. Nor does it dispute that the well has been capable of continuously producing hydrocarbons in paying quantities since its completion. According to the applicable legal authority, which PenSa does not contradict, Bays's conduct reflects an intent to complete the well and the actual completion of the well. Thus, the work performed in June 2006 satisfies the requirement for "commencement" of the well.

PenSa next argues that it cannot be placed in "non-consent" status by virtue of its election not to participate in the Brinlee Ann Marie well because Bays violated the terms of the parties' agreements regarding the time in which the well could be commenced. According to the Treasure

10

Valley AMI agreement, after the initial test well is completed, drilling of a subsequent well "shall not commence" until "90 days after the date of first production in the initial test well without the written approval of the parties hereto." Bays Ex. 1, p. 2. The parties agree the initial test well was the Laticia Lee No. 1. PenSa does not dispute that it was completed on or about September 7, 2005 and that initial production occurred in October, 2005. Bays Exs. 4 and 5. However, it argues this is not sufficient to constitute "first production" under the parties' agreement because the well produced for only about two weeks in October and a few days in March, 2006; it argues the evidence shows that "sustained production" did not occur until as late as April 30, 2006. Thus, it argues that Bays's April 21, 2006 proposal for the second well, the Brinlee Ann Marie, was contrary to the express provisions of the parties' agreement because it was submitted less than 90 days after the date of first (sustained) production from the Laticia Lee No. 1 well.

Notwithstanding the agreement's express language that the time period is triggered by the the "date of first production," PenSa repeatedly states that the relevant time is the date of "sustained production"; although it does not dispute that "first production" from the test well occurred in October of 2005, it adamantly argues that this "first production" did not trigger the 90-day time period because it was not "sustained production." However, PenSa points to no evidence or authority supporting its view that "first production" requires "sustained" production, nor does it cite any portion of the parties' agreements referencing "sustained" production or explaining what would constitute satisfactory "sustained" production for this purpose. The provision of the Treasure Valley AMI agreement which PenSa expressly quotes does not mention "sustained" production, but provides that the relevant time in which a second well can be commenced is 90 days after "the date of first production in the initial test well." Bays Ex. 1, p. 2. PenSa's argument lacks legal authority

11

and evidentiary support, and does not persuade the Court that Bays's drilling of the Brinlee Ann Marie well was untimely or in violation of the parties' agreements.

PenSa also argues that its status must not be considered "non-consent" because, notwithstanding the parties' agreements regarding the dates on which wells subsequent to the initial test well could be proposed, Bays and PenSa agreed that no well would be proposed more than 30 to 45 days prior to its anticipated spud date. PenSa argues the Brinlee Ann Marie well proposal was distributed more than 45 days before the anticipated spud date. PenSa's argument is based on the Treasure Valley North AMI agreement[4] provision stating that it is "the intent of Bays and PenSa that no well will be proposed more than 30 days prior to the anticipated spud date." Bays Ex. 1, p. 2. According to PenSa, the Treasure Valley AMI agreement contains a statement that the proposals will not be made more than 45 days prior to the anticipated spud date.

PenSa contends that this language is more than an expression of intent and that it constitutes a condition precedent to Bays's proposal of additional wells. PenSa suggests that, in a February 20, 2006 letter, Bays stated it "will attempt to propose wells 40 days prior to spud" for future Treasure Valley wells. PenSa Ex. 14. That Bays will *attempt* to issue well proposals within 40 days of the anticipated spud date does not, however, constitute an acknowledgment that it was *required* to do so.

As Bays points out, a JOA is a written contract subject to the rules of interpretation governing contracts. The Oklahoma statutory rules of construction establish that the language of

---

[4] According to the parties, a separate AMI agreement was executed for properties in the Treasure Valley North area, and their agreement regarding those properties is reflected in the Treasure Valley North AMI agreement. The Treasure Valley AMI agreement refers to the parties' intent that well proposals will not be made more than 45 days prior to the anticipated spud date, while the Treasure Valley North AMI agreement refers to a 30-day time period. The parties do not expressly point to any other differences in the terms of the two agreements.

12

a contract governs its interpretation, if the language is clear and explicit and does not involve an absurdity. Okla. Stat. tit. 15 §§ 154,155. A contract is to be taken as a whole, giving effect to every part if reasonably practicable, each clause helping to interpret the others. Okla. Stat. tit. 15 § 157.[5] A contract must receive such an interpretation as will make it operative, definite, reasonable, and capable of being carried into effect. Okla. Stat. tit.15 § 159.

As Bays also argues, precatory statements of intent do not alter the express and unambiguous language of a contract. A "mere recital of the intention of the parties" may be disregarded where the operative clauses are clear and unambiguous. *Thomas v. Dancer*, 264 P. 2d 714, 717-18 (Okla. 1953).

In this case, the fact that the parties indicated their intent that a well will not be proposed more than 30 or 45 days prior to the anticipated spud date does not alter the clear and unambiguous terms of the AMI agreements and the JOA provisions providing that Bays must commence operations no later than 120 days following the date of a well proposal. No other express provision of the applicable agreements requires delaying the distribution of a well proposal to 30 or 45 days prior to the anticipated spud date. The operative clauses governing well proposals and deadlines governing drilling operations are clear and unambiguous, and the parties' expression of intent does not alter the obligations set forth therein. PenSa's contentions are not sufficient to create a material fact dispute with regard to the propriety of the date on which the Brinlee Ann Marie well was proposed.

PenSa asserts this same argument with respect to the Wildhorse, Sandra Kay and Maria wells. It admittedly did not respond to the well proposals submitted by Bays for these wells; it did

---

[5]"A contract must be considered as a whole ... without narrowly concentrating upon some clause or language taken out of context." *Mercury Investment Company v. Woolworth Company*, 706 P.2d 523, 539 (Okla. 1985).

not complete an election form. Under the Treasure Valley North AMI agreement and the JOAs, PenSa was required to notify Bays of its election to participate and to pay its full share of dry hole costs within 30 days of receiving a well proposal. Bays Ex. 1, pp. 2-3; Ex. 2, pp. 5-6. PenSa does not dispute that, with respect to the Wildhorse, Sandra Kay and Maria wells, PenSa did not submit an election to participate or pay its share of dry hole costs. However, PenSa now contends it should not be bound by its prior decision not to participate because Bays proposed each of these wells more than 30 days prior to their anticipated spud dates. For the reasons discussed above, that argument is not persuasive and does not create a material fact dispute precluding judgment in favor of Bays on its declaratory judgment claims regarding these wells.

The final well at issue is the Joey No. 1-35 well, formerly known as the Konlee Jae No. 2-35. Bays also seeks a declaratory judgment that PenSa is in "non-consent" status as to this well because it did not elect to participate within the 30 day period required by the parties' agreements. According to the evidence, Bays prepared its proposal on or before January 25, 2007, and sent it to PenSa via facsimile on January 25, 2007. Bays Ex. 13. On February 28, 2007, PenSa notified Bays of its election to participate in the well. Bays now contends the election was made four days after the deadline in the parties' agreements and, as a result, is ineffective.

PenSa does not respond to Bays's argument regarding the untimely election. Instead, it again relies on its arguments regarding the intent of the parties that well proposals not be submitted more than a specified period prior to the anticipated spud date. As Bays suggests, and as the Court has concluded, that statement of intent does not alter the clear terms of the agreements. Because PenSa does not dispute that its election was not made within 30 days as required by the agreements, it did not timely elect to participate.

14

Having carefully reviewed the parties' exhibits and legal authority, the Court concludes, for the reasons set forth herein, that Bays is entitled to partial summary judgment to the extent it seeks a declaratory judgment that PenSa has relinquished its rights to participate in the Brinlee Ann Marie well. It is also entitled to judgment on its contentions that PenSa's election to participate in the Joey No. 1-35 well was untimely and resulted in PenSa's classification as "non-consent" as to that well. In addition, Bays is entitled to judgment on its contentions that PenSa failed to respond to well proposals for the Wildhorse, Sandra Kay, and Maria, and has relinquished its right to participate in those wells.

Claims for unpaid operating expenses and assertion of liens:

Bays also seeks summary judgment on its claim that PenSa breached the JOAs by failing to pay its obligations represented by joint interest billings submitted by Bays for the oil and gas wells in which PenSa elected to participate. Bays contends that PenSa owes in excess of $1.3 million in past-due payments. Bays argues the failure to pay also constitutes an event of default under the agreements and entitles it to suspend PenSa's rights under their agreements as well as to enforce an operator's lien that is valid and superior to PenSa's interest in the subject wells and properties.

PenSa argues summary judgment is inappropriate on these claims because there are numerous disputed facts regarding the propriety of certain billings, the amount of the charges, and the amount owed, if any, by PenSa. PenSa also argues that it is entitled to offset any amounts that may be due and owing because some of the amounts for which it was billed are overcharges or amounts attributable to Bays's breach of its obligations under the parties' agreements. PenSa also argues that Bays improperly and prematurely suspended PenSa's right to receive operating

15

information regarding one well after PenSa's payment was delayed; PenSa notes that the parties' agreements required Bays to first notify PenSa and give it an opportunity to pay the delinquent billing prior to suspending its rights. PenSa further contends that Bays has continued to receive revenues attributable to PenSa's interests, and that those revenues exceed expenses as to some of the wells. Under such circumstances, PenSa contends Bays has improperly pursued operator's liens.

The Court has reviewed the parties' contentions and the exhibits in the record and concludes that there are material fact disputes raised by Bays's claims and PenSa's counterclaims related to the payment of joint interest billings and the amounts of such billings. The Court concludes that the claims for recovery of unpaid amounts and the propriety and enforcement of operator's liens cannot properly be adjudicated in a summary judgment motion. Accordingly, the partial summary judgment motion is denied as to these claims.

PenSa's breach of fiduciary duty counterclaim:

Bays asks the Court to enter judgment in its favor on PenSa's counterclaim that it is entitled to damages based on Bay's alleged breach of its fiduciary duty to PenSa. Bays contends that PenSa cannot, as a matter of law, prevail on that claim because the JOAs expressly disclaim any fiduciary relationship between the operator and non-operating working interest owners; furthermore, Bays argues Oklahoma has expressly held a JOA does not create fiduciary obligations.

As Bays correctly points out, the JOAs governing the relationship of Bays, as operator, and PenSa, as a non-operator, expressly provide that the parties to the JOA "shall not be considered fiduciaries." *See* Model Form Operating Agreement, Article VII(A), Bays Reply Ex. 1 at p. 11. In fact, in its response brief, PenSa concedes that the JOAs disclaim the existence of a fiduciary obligation. Response brief at p. 5. PenSa argues that, notwithstanding the provisions of the JOAs,

Bays owed it a fiduciary duty which can be remedied in tort.

As Bays points out, however, the Oklahoma courts have repeatedly held that an operator does not owe its non-operating working interest owners a fiduciary obligation; instead, the duties imposed by a joint operating agreement are contractual obligations:

> In Oklahoma, oil and gas operators have no fiduciary duty to non-operators arising solely from contracts such as leases, communitization agreements, or joint operating agreements. *Howell v. Texaco Inc. (Howell)*, 2004 OK 92, 112 P.3d 1154, 1160-1161, and *Tarrant v. Capstone Oil and Gas Co. (Tarrant)*, 2008 OK CIV APP 17, 178 P.3d 866, 870-871. An operator's breach of duties under such agreements gives rise to a breach of contract claim, not a breach of fiduciary duty claim. *Tarrant*, 178 P.3d at 871.

*Hebble v. Shell Western E & P, Inc.,* 238 P.3d 939, 943 (Okla. Civ. App. 2009). *See also Sparks Bros. Drilling Co. v. Texas Moran Exploration Co.*, 829 P. 2d 951 (Okla. 1991).

As the Court in *Hebble* pointed out, the Oklahoma Supreme Court has recognized that a fiduciary duty may arise where a unitization order is in place. *Hebble*, 238 P. 3d at 943. However, this is "'not a duty created by the lease agreement but rather by the unitization order and agreement.'" *Id.* (quoting *Leck v. Continental Oil Co.*, 800 P.2d 224, 229 (Okla. 1989)). "'After unitization, the leases no longer control.' *Howell*, 112 P.3d at 1161. Instead, the parties' relationships are defined by statute and by Commission order." *Hebble*, 238 P. 3d at 943.

Thus, PenSa's contention that Bays's alleged breach of certain obligations under the JOA's constitutes a breach of fiduciary duty must be rejected.[6] To the extent PenSa seeks to assert this cause of action, Bays is entitled to judgment.

---

[6] The decisions on which PenSa relies to support its fiduciary duty claim are distinguishable, as most involve the obligations of a unit operator rather than the duties arising from a JOA. *See, e.g.,Leck v. Continental Oil Co.*, 800 P. 2d 224 (Okla. 1989); *Young v. West Edmond Hunton Lime Unit*, 275 P. 2d 304 (Okla. 1954). Although it correctly points out that the Tenth Circuit Court of Appeals referred to a duty of good faith in *Reserve Oil, Inc. v. Dixon*, 711 F. 2d 951 (10th Cir. 1983), the Circuit did not recognize a cause of action in tort for a breach of fiduciary duty.

PenSa's counterclaim for breach of the duty of good faith and fair dealing:

PenSa also argues that, in addition to a fiduciary duty, the JOAs impose upon Bays a duty of good faith and fair dealing, and Bays breached that duty. Bays also seeks judgment on this claim, arguing that Oklahoma does not recognize that cause of action in the context of a JOA; alternatively, Bays contends that the conduct on which PenSa relies to support this claim is insufficient to sustain a separate cause of action based on a breach of the duty of good faith and fair dealing.

Under Oklahoma law, there can be no breach of an implied duty of good faith to perform under a JOA, as the duty of good faith and fair dealing does not extend to the contractual relationship created by a JOA. *Davis v. TXO Production Corp.*, 929 F. 2d 1515, 1519 (10th Cir. 1991) (applying Oklahoma law). As PenSa notes, however, the JOAs executed by Bays and PenSa each contain a provision which, although disclaiming the existence of a fiduciary relationship, recognizes the parties' obligations "to act in good faith in their dealings with each other with respect to the activities hereunder." *See* JOA Article VII (A), Bays Reply Ex. 1, at p. 11. Thus, the question is whether this language is sufficient to overcome the general rule that a JOA does not create a duty of good faith and fair dealing.

In *Davis,* the Tenth Circuit did not address the impact of a JOA clause acknowledging the parties' mutual obligation to act in good faith; it appears the JOA at issue in that case did not contain such language, and the decision discussed an implied covenant of good faith. Furthermore, the authorities cited by Bays and PenSa do not interpret agreements containing clauses expressly recognizing the parties' mutual obligation to act in good faith with respect to the activities governed

18

by the JOA. The Court has located no Oklahoma decision expressly applying a similar provision.

Bays is correct that, under Oklahoma law, an operator's breach of duties under the JOA "gives rise to a breach of contract claim." *See, e.g., Hebble*, 238 P. 3d at 943; *Tarrant v. Capstone Oil and Gas Co.*, 178 P. 3d 866, 871 (Okla. Civ. App. 2008). Although *Hebble* and *Tarrant* expressly rejected a claim for breach of a fiduciary duty and did not consider whether a claim for bad faith could be based on a breach of the obligations in a JOA, its emphasis on the JOA as creating contractual duties is instructive. A JOA is a contract, and a breach of its provisions constitutes a breach of contract. *See, e.g., Tarrant*, 178 P. 3d at 870-71. In its claim asserting bad faith, PenSa expressly relies on a provision of the JOA as creating a mutual obligation of good faith; thus, its cause of action is a breach of contract claim rather than a tort claim. To the extent that PenSa seeks to recover in tort, Bays's motion for summary judgment is granted.

Bays also argues that, even if the JOA language is sufficient to create a duty of good faith, PenSa has failed to allege facts sufficient to establish a separate cause of action based on a breach of that duty. As Bays points out, the factual contentions on which PenSa relies to support this claim are the same as those underlying its breach of contract claims. PenSa argues Bays breached the duty of good faith by refusing to timely distribute revenues to PenSa, by failing to account for expenses and revenues, and by failing to provide PenSa with production and operating information. *See* PenSa response brief at p. 15. These contentions allege breaches of specific contractual duties and obligations of Bays under the JOAs, and thus may form the basis for PenSa's claims that Bays breached the contractual provisions of the JOAs, as set forth in its counterclaim allegations.

To the extent Bays suggests that PenSa cannot obtain a recovery on two causes of action asserting the same allegations and seeking identical damages, it is correct. However, the Court

19

cannot determine from the record before it that PenSa does not seek a separate recovery based on an alleged breach of the good faith provision in the JOA. Subject to that limitation, PenSa may pursue a contract claim for breach of the JOA based on the good faith provision, and summary judgment is denied as to that claim.

Conclusion:

For the reasons set forth herein, the motion for partial summary judgment of Bays [Doc. No. 190] is GRANTED in part and DENIED in part as set forth herein. The action will proceed on the remaining claims and counterclaims.

IT IS SO ORDERED this  10th  day of February, 2011.

_____
TIMOTHY D. DEGIUSTI
UNITED STATES DISTRICT JUDGE