## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| BAYS EXPLORATION, INC., a Texas corporation; BAYS ENERGY PARTNERS 2007 L.P., a Texas limited partnership, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | NO. CIV-07-754-D |
| PENSA, INC., a Colorado corporation, | ) ) | |
| Defendant. | ) | |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND JUDGMENT

I. Background:

      Plaintiffs Bays Exploration, Inc. ("Bays") and Bays Energy Partners 2007 L.P. ("Bays Energy") brought this action to recover amounts allegedly due and owing by PenSa, Inc. ("PenSa") arising from the drilling and operation of a number of jointly owned oil and gas wells located in Oklahoma. Bays is the operator of the subject wells, and PenSa claims a non-operator working interest in those wells. Bays and Bays Energy asserted ten claims for relief; in its counterclaims, PenSa asserted fifteen claims for relief. Prior to the nonjury trial, several claims and counterclaims were adjudicated in the Court's Orders [Doc. Nos. 217 and 218] ruling on the partial summary judgment motions of Bays and Bays Energy.[1]

---

[1]Bays's motion was granted in part and denied in part. The motion was granted on Bays's claims that PenSa has no right to participate in certain wells because the undisputed facts show PenSa either failed to timely elect to participate, affirmatively declined to do so, or failed to respond to participation proposals. With respect to Pensa's counterclaim alleging Bays breached a fiduciary duty to PenSa, Bays's motion was granted because an operator's duty under Oklahoma law is contractual rather than fiducial. Bays's motion was also granted on PenSa's counterclaim characterizing Bays's alleged breach of the duty of good faith and fair dealing as a tort claim; the motion was denied to the extent the breach of that duty is asserted as a contract claim. Because the record reflected material factual disputes regarding Bays's claims for recovery of PenSa's unpaid joint interest billings and Bays's contention that it was entitled to suspend PenSa's rights, summary judgment was denied on those claims. The Court granted Bays Energy's separate motion on PenSa's counterclaims asserting violations of the preferential right to purchase, the preferential right to sell, and the maintenance of uniform interest provisions in the parties' agreements because the undisputed material facts established these provisions were not violated.

Prior to trial, the parties entered into stipulations of fact [Doc. No. 258].  Commencing in December of 2011 and concluding in January of 2012, the Court conducted a nonjury trial which required approximately six full trial days.  The Court heard extensive testimony from both fact and expert witnesses, and received hundreds of exhibits.  In addition, the parties presented some evidence through designations of deposition testimony. At the close of the trial, the Court authorized the parties to present their closing arguments in the form of written submissions, and it also allowed them to file revised proposed findings of fact and conclusions of law.

The Court has now had an opportunity to review the extensive evidence and the parties' arguments in light of the governing law.  Having done so, the Court finds and rules as follows.

II.  Findings of Fact:

Bays is a Texas corporation with its principal place of business in Oklahoma City, Oklahoma.

Bays Energy Partners is a Texas limited partnership also having its principal place of business is in Oklahoma City.  PenSa is an oil and gas exploration company whose principal place of business is in Littleton, Colorado.   Stipulated Fact No. 1.

Joe Bays is the owner and president of Bays, and he has been involved in the oil and gas industry for more than 30 years.  Joe Bays testimony, Trial Transcript ("Trial Tr.") vol. I, 41:23-43:2, Dec. 5, 2011.  During the first 10 years of his career, Mr. Bays operated Bays Oilfield Supply Company ("BOSC"), which was engaged primarily in the purchase and sale of oilfield equipment, including tubular goods, casing, and line pipe. *Id.,* 42:21-45:10.  Through this business, Mr. Bays and BOSC established working relationships with steel manufacturing and distribution companies, as well as other businesses providing goods and services in connection with the drilling and

operation of oil and gas wells. Trial Tr. vol. I, 45:11-20.

BOSC is a fully capitalized entity organized separately from Bays, and it has provided oilfield equipment and services for over 30 years. Trial Tr. vol. I, 42:15-45:10. At all times relevant to this litigation, BOSC maintained its own inventory of tubular goods and other oil field equipment at its own yard and other locations. Bays Ex. 178. Prior to 2006, BOSC purchased six months' worth of tubulars and equipment for its inventory; it did so because it expected the costs of such materials to escalate. Trial Tr. vol. I, 129:2-130:12; vol. VII, 1242:15-1246:8.

In the mid-1980s, Mr. Bays began acquiring ownership interests in Oklahoma oil and gas properties. Trial Tr. vol. I, 45:21-46:20. By the late 1980s, Mr. Bays had accumulated interests in approximately 100 oil and gas wells. Trial Tr. vol. I, 46:11-20. Bays was incorporated in 1990. *Id.* at 21-22. In 1995, Bays became the operator of the approximately 60 oil and gas wells in which it had an interest. Trial Tr. vol. I, 47:5-19. Since that time, Bays has operated as many as 105 wells during any given time period, and now operates 31 wells. Trial Tr. vol. I, 47:2-4.

Bays currently employs approximately 40 people. Trial Tr. vol. I, 48:7-51:3. Bays's geologist, geophysicist and exploration manager has worked for the company for almost 20 years and has more than 40 years experience in the industry. Trial Tr. vol. I, 48:14-50:5; Gonzalez Depo. vol. II at 77:24-78:4. Bays also employs a junior geologist and an experienced petroleum engineer. Trial Tr. vol. I, 48:15-50:13. In addition, Bays employs three drilling supervisors who have more than 100 years combined experience in oil and gas drilling. Trial Tr. vol. I, 147:5-7. At least one of these supervisors was present at the well site when each well at issue in this lawsuit was drilled and completed. *Id.*

PenSa has two full time employees, brothers Lou Pendleton and Edmund Pendleton (the

"Pendletons"), who serve as President and Vice-President, respectively.  Trial Tr. vol. III, 507:24-509:11; vol. VI, 951:3-10.  Edmund Pendleton has a degree in geology, has worked as an oilfield wellsite geologist on numerous wells in Kansas and Kentucky, and has been involved in the oil and gas business for approximately 30 years. Trial Tr. vol. VI, 951:13-952:1.  Lou Pendleton handles the administrative responsibilities for PenSa, while Edmund Pendleton is in charge of operations and geology.  Trial Tr. vol. VI, 951:7-10.   The Pendletons are sophisticated oil and gas investors with significant experience in the industry.  Trial Tr. vol. IV, 672:17-681:28. PenSa does not employ administrative, land, accounting, secretarial or other staff.  Trial Tr. vol. III, 508:1-509:11. PenSa's accounting functions are performed by an independent accountant, John Tanner, with whom PenSa contracts for services.  Trial Tr. vol. III, 508:21-509:9; Tanner Depo. at 5:3-8:4.

PenSa was initially capitalized by the Pendletons with contributions of $18,892. Trial Tr. vol. III, 465:22-466:6.  PenSa's business model is based on its practice of selling a substantial portion of its interests in oil and gas properties to other individuals and entities (the "Investors").[2]  Trial Tr. vol. III, 468:22-471:13, 508:8-10; vol. IV, 601:15-606:6; vol. V, 749:19-750:18; vol. VI, 1042:8-1043:2.  Pursuant to participation agreements with its Investors, PenSa earned, at a minimum, a 40 percent carried working interest "through the tanks" for each percentage point of interest sold in wells in which it owned an interest.  Trial Tr. vol. III, 468:8-469:3. As a result, in most cases, the Investors have a contractual right to receive 60 percent of PenSa's share of the revenues generated by the wells for which the Investors pay 100 percent of PenSa's share of the drilling and completion costs.  This is considered a "heavy promote" within the oil and gas industry, and it is not common

---

[2]All but two of PenSa's Investors  executed letter agreements acknowledging that PenSa has maintained legal title to the properties at issue in this lawsuit, and authorizing PenSa to pursue, for the benefit of the Investors,  all defenses and claims applicable to the Investors' interests. The Investors also agree to be bound by the judgment entered in this litigation.  PenSa Ex. 144.

within the industry for a promoter to receive such a substantial carried interest. Trial Tr. vol. III,

469:4-19. The PenSa Investors are not signatories to the Joint Operating Agreements ("JOAs")

executed by PenSa and  Bays for the properties at issue in this lawsuit.  Bays Exs. 1 and 3.

Bays is the operator of the following oil and gas wells and, at the relevant times referenced

herein, PenSa was a non-operating working interest owner in these wells:

- Wildman No. 1, N/2NW/4, Sec. 24, Township 5 North, Range 5 West, Garvin County, Oklahoma;

- Vicki Kay No. 1, W/2NW/4,Sec. 15, Township 3 North, Range 3 West, Garvin County, Oklahoma;

- R. C. Stephens No. 1, E/2NW/4, Sec. 14, Township 3 North, Range 3 West, Garvin County, Oklahoma;

- J. A. Payne No. 1, W/2, Sec. 2, T3N R3W, Garvin County, Oklahoma;

- Laticia Lee No. 1, S/2SW/4, Sec. 23, T1N, R1E , Garvin County,  Oklahoma;

- Hallee Blair No. 1, N/2NE/4, Sec. 35, T1N, R1E,Garvin County, Oklahoma;

- Konlee Jae No. 1, S/2NE/4, Sec. 35, T1N, R1E , Garvin County Oklahoma;

- Donna Sue No. 1, S/2NW/4 Sec. 35, T1N, R1E , Garvin County, Oklahoma;

- Ethel Lou No. 1, N/2NW/4, Sec. 35, T1N, R1E , Garvin County, Oklahoma;

- El Ray No. 1, S/2SW/4, Sec. 36, T1N, R1E , Garvin County, Oklahoma;

- Tammy No. 1, S/2SE/4, Sec. 36, T1N, R1E Garvin County, Oklahoma. T1N, R1E, Garvin County, Oklahoma;

- Dulaney No. 1-36 S/2NW/4, Sec. 36, T1N, R1E , Garvin County, Oklahoma; and

- Anderson No. 1, N/2SW/4, Sec. 36, T1N, R1E , Garvin County, Oklahoma.

Stipulated Fact No. 2.

The Hallee Blair No. 1, Konlee Jae No. 1, Donna Sue No. 1, Ethel Lou No. 1, Dulaney No.

1-36, Anderson No. 1, El Ray No. 1, and Tammy No. 1 wells are all located in an area known as the Treasure Valley Field, located in Garvin County, Oklahoma. Each of these wells is governed by the terms of a JOA dated November 30, 2002, covering all of Sections 35 and 36, Township 1 North, Range 1 East, Garvin County, Oklahoma (the "Treasure Valley JOA").   Bays Ex. 3.   Pursuant to a letter agreement dated November 1, 2000, by and between Wepco Energy LLC and Chaparral Energy, Inc., Bays and PenSa treated each well drilled within the Treasure Valley Prospect Area as covered by the Treasure Valley JOA.   Stipulated Fact No. 5.

    Bays and PenSa also executed an April 12, 2005 letter agreement (the "Treasure Valley North AMI Agreement"), submitted as Bays Ex. 1, covering an area of mutual interest ("AMI") in the Treasure Valley North Prospect located in Garvin and Murray Counties, Oklahoma.   The Treasure Valley North AMI Agreement covers (i) all of Sections 22, 23, 26 and 27 in Township 1 North, Range 1 East; (ii) the West Half of Section 24 of Township 1 North, Range 1 East; (iii) the West Half of Section 25, Township 1 North, Range 1 East, and (iv) the North Half of Section 34, Township 1 North, Range 1 East. The Laticia Lee No. 1 well is located in the Treasure Valley North AMI, and is the only well at issue in this lawsuit that is subject to the Treasure Valley North AMI Agreement and the Treasure Valley North JOA.   Stipulated Fact No. 6.

    The Treasure Valley North AMI Agreement sets out the percentage ownership interests of Bays and PenSa in all oil and gas leasehold interests that Bays had previously acquired in the AMI, as well as additional interests subsequently acquired by the parties within the AMI.   Stipulated Fact No. 7.   The Treasure Valley North AMI Agreement also provides that the oil and gas operations conducted within the AMI are subject to the provisions of the JOA attached as an exhibit thereto (the "Treasure Valley North JOA").   Bays Ex. 2; Stipulated Fact No. 8.

6

Prior to executing the Treasure Valley and Treasure Valley North JOAs, Bays and PenSa had, during the period of 2001 through 2003, executed JOAs covering wells located in an area known as the Golden Trend Field in Garvin County, Oklahoma ("Golden Trend Wells"). In 2010, PenSa sold its interests in the Golden Trend Wells.[3] The Golden Trend Wells are not at issue in this lawsuit, as Bays does not seek recovery from PenSa of any amounts attributable to costs for those wells. Stipulated Fact Nos. 3 and 4.

Bays proposed to PenSa, and PenSa elected to participate in, the drilling or re-drilling of the following wells in Garvin County, Oklahoma: Dulaney No.1-36, Anderson No. 1, Hallee Blair No. 1-R, Laticia Lee No. 1, Konlee Jae No.1, Donna Sue No. 1, Ethel Lou No. 1, El Ray No.1, Tammy No.1, Wildman No.1, Vicki Kay No. 1, R.C. Stevens No. 1, and J.A. Payne No. 1. Stipulated Fact No. 9. Bays also proposed to PenSa the completion or recompletion of those same wells, and PenSa again elected to participate. Stipulated Fact No. 10. Bays submitted to PenSa joint interest billing statements ("JIBs") which represent PenSa's proportionate share of the drilling, completion, recompletion, and lease operating expenses for these wells. Stipulated Fact No. 11.

All JOAs governing the relationship of Bays and PenSa adopt and incorporate the accounting procedures of the Counsel of Petroleum Accountants Societies ("COPAS").

The JOAs governing the wells in which PenSa participated provide that payments for monthly JIBs are due within 15 days of the non-operator's receipt of the JIB. JOAs, Bays Ex. 1 at p. 35; Bays Ex. 3 at p. 30.

The JOAs also provide that failure to timely pay JIBs within the 15-day time period constitutes an event of default and, if the default is not cured within a specified time period, the

---

[3]The Golden Trend Wells are the Wildman No. 1, the Vicki Kay No. 1, the R.C. Stevens No.1, and the J.A. Payne No. 1.

operator may suspend the non-operator's rights; as a non-operator, PenSa was subject to this penalty for non-payment. JOAs Art. VII (D)(1), Bays Exs. 1 and 3.   Failure to timely pay JIBs also authorizes the operator to file an operator's lien that is superior to a non-operator's interests in the wells and properties for which timely payment of JIBs was not made.  JOAs, Art. VII(B),  Bays Exs. 1 and 3.  Where a non-operator fails to remit payment within the 15-day time period required by the JOAs, the unpaid balance is also subject to interest.  Under the Treasure Valley JOA, this interest is charged at the prime rate in effect at Chase Manhattan Bank of New York on the first day of the month in which delinquency occurs plus 1 percent.  JOA, Bays Ex. 3 at p. 30, COPAS Art. I(3)(B). Under the Treasure Valley North JOA, interest is charged at the prime rate in effect at Bank of Oklahoma on the first day of the month in which delinquency occurs plus 3 percent.[4] JOA, Bays Ex. 1 at p. 35, COPAS Art. I(3)(B).

    PenSa did not pay all JIBs submitted to it by Bays.  By December of 2008, PenSa's internal books and records reflected that it owed Bays $874,217 in unpaid JIBs.  This amount has not been paid by PenSa, and, as of May 31, 2011, the amount owed, with interest accrued to that date, was $1,572,905.09.  Bays Exs. 282, 284.

    The COPAS procedures provide that timely payment of JIBs does not preclude a non-operator from challenging the accuracy of the paid JIBs.  According to COPAS, timely payment of JIBs by a nonoperator "shall not prejudice [its] right ... to protest or question the correctness" of the JIB charges. Bays Ex. 1 at p. 35, COPAS Art. I(4); Bays Ex. 3 at p. 30, COPAS Art. I(4).  COPAS also provides that non-operators "shall have the right to audit Operator's accounts and records

---

[4]Both JOAs provide that the interest rate applied is the lesser of that specified in the JOA or the rate allowed by state law.  It is not disputed that the interest rates in the JOAs are less than the rate allowed by Oklahoma law. Accordingly, the interest rates specified in the two JOAs are applicable.

relating to the Joint Account for any calendar year within the 24-month period following the end of

such calendar year."  JOAs, Exs. 1 and 3; COPAS Art. I.5.A.  Pursuant to COPAS, if an audit is

conducted by a non-operator, the operator "shall reply in writing to an audit report within 180 days

after receipt of such report."  *Id.*

The non-operator's right to challenge entries on JIBs is, however, subject to a time

limitation, as statements or bills which are not challenged in writing by a non-operator within 24

months are presumed to be true and correct.  The COPAS provision in the JOAs states:

> [A]ll bills and statements rendered to Non-Operators by Operator
> during any calendar year shall conclusively be presumed to be true
> and correct after twenty-four (24) months following the end of any
> such calendar year, unless within the said twenty-four (24) month
> period a Non-Operator takes written exception thereto and makes
> claim on Operator for adjustment.

JOAs, Bays Exs. 1 and 3, COPAS Art. I(4).

PenSa acknowledges that, as a non-operator of the wells operated by Bays, it had the

foregoing obligations and rights as set forth in the COPAS provisions of the JOAs.

On December 26, 2007, PenSa exercised its right to conduct an audit  pursuant to COPAS

for charges made by Bays to the joint account in calendar years 2005, 2006, and 2007.   The audit

request covered the Laticia Lee No. 1, Anderson No. 1, Konlee Jae No. 1, Dulaney No. 1, El Ray

No. 1, Tammy No. 1, Donna Due No. 1, Ethel Lou No. 1, Hallee Blair No. 1, Hallee Blair No. 1-R,

J. A. Payne No. 1, Vicki Kay No. 1, R.C. Stephens No. 1, and Wildman No. 1 wells.  Bays Ex. 155.

In requesting the audit, PenSa stated, "[t]he scope of this audit will include the drilling, completion,

and equipment charges on these wells and Lease Operating Expenses."  *Id.*

Bays complied with the request for an audit.  The firm of Bidwell & Collins LLC (the

"Auditor") conducted the audit on behalf of PenSa.  Robert Bidwell of that firm gathered and copied

a representative sample of vendor invoices at Bays's office.  Bidwell Depo. at 20:14-23, 21:21-22:11.  The Auditor was present at Bays's office for four days, was provided an office in which to work, and was given access to over 20,000 documents. Robert Collins Depo. at 35:1-21; Trial Tr. vol. I, 152:18-25; vol. III, 435:10-439:8.  The Auditor requested copies of over 800 separate invoices for the review process.  Trial Tr. vol. III, 438:5-7.  The parties agree that Bays provided the Auditor with all information he requested.  Trial Tr. vol. I, 152:18-25; vol. III, 436:3438:1, 473:18-24.

Prior to conducting the Audit, the Auditor was specifically instructed by PenSa to review all transactions involving Bays's third-party affiliates.  Collins Depo. at 51:1-14.  Pursuant to these instructions, the Auditor asked about the relationship between Bays and BOSC, and was provided with this information.  Trial Tr. vol. III, 438:8-15.   The Auditor testified that it was not improper for Bays to utilize BOSC for the purchase of materials or the provision of services, and it is not uncommon for an operator to utilize the services of an affiliated company.  Collins Depo. at 51:15-52:13.  He also testified that it is proper for an operator to utilize an affiliated company which maintains an inventory of supplies, as doing so ensures the availability of materials to supply the wells when needed.  *Id.* at 52:1-21.

The Auditor completed the Audit and provided a copy of the final report (the "Audit Report") to PenSa on or about July 22, 2008, but PenSa did not submit the Audit Report to Bays until December 5, 2008.  A copy of the Audit Report was admitted as Bays Ex. 157.

The Audit Report confirms  the Audit was conducted in accordance with the guidelines of the American Institute of Certified Public Accountants and COPAS.  Bays Ex. 157 at p. 3.  The Audit Report identifies certain exceptions with a total monetary value of $198,762.38, broken out into two general categories: (i) $42,682.94 in certain "non-direct" operating expenses that the

Auditor believed should not be charged to the Joint Account under COPAS guidelines; and (ii) a total of $158,079.44 arising from fourteen (14) invoices that, according to the Auditor, were coded to the wrong properties or cost center. *Id.* PenSa's accountant testified that PenSa's dispute with Bays regarding billing issues "is detailed in the audit report." Tanner Depo. at 37:5-18. PenSa does not disagree with the results of the Audit, and "accept[s] the work [the Auditor] did." Trial Tr. vol. IV, 554:25-555:3.

On June 5, 2009, Bays provided its written response to the Audit Report. Bays Ex. 158; Trial Tr. vol. III, 446:6-452:6. It is not disputed that Bays's response was timely, as it was submitted within the 180-day deadline required by COPAS Art. I (5)(A). In its response, Bays disagreed with some of the Auditor's findings. Bays addressed each exception identified by the Auditor, provided its explanation for the questioned charges, and concluded that PenSa was due a total credit of $5,304.97 for items covered by the Audit. Bays Exs. 158, 257, 258. This amount was credited to PenSa's account. Trial Tr. vol. III, 450:5-10. PenSa did not object or otherwise respond to Bays's response to the Audit, nor did it challenge the accuracy of the amount credited to PenSa as a result of the Audit. Trial Tr. vol. III, 452:7-23.

PenSa did not exercise its right to conduct a COPAS audit for calendar years 2008, 2009, 2010 or 2011. Prior to the filing of this lawsuit, PenSa never submitted to Bays any written exception or question regarding any bill or statement issued by Bays during the calendar years 2008 through 2011, nor did PenSa ever make a written claim or demand on Bays for an adjustment to any bill or statement issued during these calendar years. PenSa did not challenge the propriety of the JIBs which were not reviewed in the Audit until it asserted its counterclaims in this lawsuit. PenSa's amended answer and counterclaim for an accounting was filed on January 23, 2008.

On or about February 22, 2007, Bays entered into a purchase and sale agreement with Bays Energy. Bays Ex. 154. Under the terms of that agreement, Bays agreed to sell to Bays Energy the majority of its right, title and interest in and to numerous oil and gas properties, including the wells in which PenSa owned an interest, except for Bays's interest in the Woodford formation in certain of the subject properties; that interest was retained by Bays. Although the purchase and sale agreement is dated February 22, 2007, it establishes July 1, 2006 as the effective date. Bays Ex. 154 at 7, 28. The purchase and sale agreement also contains certain "back-in" provisions that would allow Bays to re-acquire a greater ownership percentage in the subject properties. Trial Tr. vol. I, 101:15-102:16. These "back-ins" were potentially worth millions of dollars to Bays. *Id.*

PenSa's financial condition worsened significantly from 2004 to 2008, with its ratio of current assets to current liabilities shrinking from 10.6 to 0.5 during this time period. Bays Ex. 282; Trial Tr. vol. III, 466:3-20. Between 2005 and 2006, PenSa's liabilities exceeded its assets, resulting in a negative equity ratio. According to Bays's expert witness, Harry Potter, a current ratio at or below 1 constitutes a negative equity ratio, and indicates that a company is unable to pay its obligations as they become due, and cannot fund future large capital expenditures or take on additional debt. Bays Ex. 282; Trial Tr. vol. III, 466: 3-25. PenSa's negative equity ratio became much worse during the period of 2005-2008. *Id.* In 2006, PenSa became "balance sheet insolvent," and had a deficiency in retained earnings or equity of more than $200,000. Trial Tr. vol. III, 466:3-11. This deficiency grew to an average of around $400,000 for the years 2007 and 2008. *Id.* at 466:12-14. As a result, PenSa did not have sufficient assets to cover its obligations. Trial Tr. vol. III, 466:15-468:7.

As of December 2006, PenSa had a negative 12.25 percent equity ratio. Bays Ex. 282. As

early as 2006, PenSa lacked the capital to timely pay its outstanding bills. Trial Tr. vol. III, 465:22-468:7.  It is undisputed that, despite its poor financial condition,  PenSa committed to participate in several additional wells drilled by Bays after December 2006.

Mr. Potter testified that, because PenSa was undercapitalized from its inception, it lacked capital of its own to satisfy its obligation under the JOAs to pay the monthly JIBs attributable to the large percentage interests it owned.  Trial Tr. vol. III, 467:22-468:7.  PenSa generally relied on the Investors to timely remit monies to PenSa so that PenSa would have funds sufficient to pay the monthly JIBs.  Trial Tr. vol. IV, 616:5-617:16; Bays Ex. 282.

Upon receiving a monthly JIB from Bays, PenSa submitted its own billing to the Investors so that they would submit payment to PenSa, which, in turn,  remitted payment to Bays. Trial Tr. vol. IV, 617:13-618:25. PenSa encountered difficulty in receiving its Investors' funds in time to pay JIBs within the 15-day period required by the JOAs, and it asked Bays to apply, on a monthly basis, the revenues attributable to PenSa's interest in the subject wells to the amounts PenSa owed on the monthly JIBs.  Trial Tr. vol. I, 96:16-97:5;  Ramsey Depo. vol. I, 105:1-10.

Bays initially complied with this request, and netted PenSa's monthly revenues against the costs shown on the monthly JIBs.  After a PenSa Investor complained to Bays in 2006 that he was not receiving his share of revenues, Bays discontinued this practice, and instead required PenSa to pay its full JIB share each month.  Trial Tr. vol. I, 97:6-98:11; vol. II, 262:4-18; Ramsey Depo.  vol. II, 179:5-180:3.

Even during the time period in which its revenues were netted to reduce its direct JIB obligations, PenSa routinely failed to pay its monthly JIBs within 15 days of receipt, as required by the JOAs.  Beginning in 2006, and continuing through May of 2009, Bays repeatedly sent PenSa

notices advising PenSa of its default for failing to timely pay JIBs.  From 2006 through the early part of 2008, these "Notice of Default" form letters also advised PenSa that its rights were suspended pending PenSa's cure of the default.  That portion of the form letters was incorrect because the JOAs provide that a defaulting non-operator has 30 days in which to cure a default before its rights may be suspended.  The form notices were originally drafted by Bays's former landman, Joe Van Auken, who testified that the failure to include the 30-day cure period was based on his own mistaken interpretation of the JOA requirements, and the notices were not intentionally drafted to shorten PenSa's time period to cure defaults.  Trial Tr. vol. V, 906:14-910:14, 923:23-924:8.

PenSa did not complain about the error in these initial notices until after this lawsuit was filed.  In fact, upon receipt of the notices during the 2006 through 2008 time period, PenSa typically paid the amounts required to cure its defaults.  Throughout the parties' relationship, however, PenSa routinely failed to pay its monthly JIBs until after it received a notice of default.  It was not uncommon for PenSa to delay making payments until around the 25th day of the 30-day cure period. Trial Tr. vol. II, 372:4-11; vol. IV, 620:1-622:11; vol. V, 929:16-930:13.

Ultimately, PenSa failed to make even delayed payments of JIBs.  On December 1, 2008, after JIBs to PenSa remained unpaid for a period exceeding  90 days, Bays sent new  notices of default to PenSa.  These notices corrected the language in the former default notices, and allowed PenSa 30 days in which to cure a default before its rights would be suspended.  The notices dated December 1, 2008 and thereafter further specified that PenSa's failure to cure the defaults would result in Bays's exercise of one or more of the remedies provided in the JOA when a non-operator fails to cure a default.  PenSa Ex. 8 at pp. 38-43, 47-65.

The first correct notice of default relating to PenSa's interest in a well governed by the

Treasure Valley JOA was issued on December 1, 2008.  PenSa Ex. 8 at p. 38.  The first correct

notice of default relating to PenSa's interest in a well covered by the Treasure Valley North JOA

was issued on May 12, 2009.  PenSa Ex. 8 at p. 60.  PenSa's expert witness, John Reeves, testified

that all notices of default issued by Bays to PenSa on and after December 1, 2008 were in the proper

form required by the JOAs.  Trial Tr. vol. VII, 1312:19-1313:9, 1337:14-1338:23.

In January 2008, after nearly two years of consistently failing to pay JIBs within 15 days of

their receipt, PenSa stopped all JIB payments to Bays, including those attributable to PenSa's

investment in new wells and its share of the operational costs of drilled and completed wells.  PenSa

has not paid its proportionate share of the monthly JIBs since February of 2008.  Bays Exs. 79, 81,

84, 86, 88, 90, 92, 94, and 96.  Nevertheless, PenSa continued to collect funds from its Investors

from February 2008 until early January 2009.  Trial Tr. vol. V, 877:23-879:17.

After PenSa failed to cure the defaults in its JIB payments, Bays notified PenSa on February

12, 2009 that PenSa's rights under the Treasure Valley JOA were suspended until such time as

PenSa cured the  defaults.  PenSa Ex. 8 at pp. 47-51.  On July 22, 2009, Bays notified PenSa that

PenSa's rights under the Treasure Valley North JOA were suspended until PenSa cured the defaults.

PenSa  Ex. 8 at p. 65.   PenSa has never paid any amounts identified in the notices of default issued

from and after December 2008, nor has it otherwise taken any action to cure its default status.

On February 17, 2009,  Bays filed operator's liens against all of the interest owned by PenSa

in the wells for which PenSa remained in default on its payment obligations.  Bays' Exs. 79, 81, 84,

86, 88, 90, 92, 94, and 96.  PenSa's expert witness, John Reeves, did not dispute that the liens were

perfected and are in the proper form required by the JOAs and Oklahoma law.  Trial Tr. vol. VII,

1325:17-25; 1330:1-9.

15

After suspending PenSa's rights, Bays also withheld revenue payments to PenSa. It established an escrow account at Bank of Oklahoma, N.A., and has deposited into such account all revenues attributable to PenSa's interests in the wells in which PenSa's rights were suspended. Bays Ex. 211; Trial Tr. vol. I, 108:20-109:16. At the time of Mr. Bays's trial testimony on December 5, 2011, approximately $500,000.00 was held in the escrow account. Trial Tr. vol. I, 109:14-16. There is no evidence that Bays has failed to deposit all revenues accruing to PenSa's interest into the escrow account.

PenSa admits it failed to pay the JIBs, but contends it was not required to do so for several reasons, each of which is based on the argument that Bays materially breached the JOAs or that it was grossly negligent in its operation of the wells. On January 9, 2009, approximately one month after it submitted the COPAS Audit Report to Bays but before Bays was required to respond, PenSa sent a letter in which it accused Bays of materially breaching the JOAs in several ways. PenSa Ex. 8.[5] Initially, PenSa contends Bays improperly suspended its right to receive information regarding the subject wells sometime prior to December of 2008. However, the evidence shows that, as of the date of his depositions in May and June 2009, Edmund Pendleton had not conducted any analysis to determine whether any alleged lack of information from Bays had impacted PenSa's decision on any well. Trial Tr. vol. VI, 1012:19-1014:13. There is no evidence that PenSa ever indicated to Bays that it lacked sufficient information to make an election with respect to proposed operations on any well. Trial Tr. vol. VI, 1028:17-21. In fact, there is evidence to the contrary. The evidence shows that PenSa not only received drilling, completion and production information from Bays, but that it shared this information with its Investors. Trial Tr. vol. VI, 1018:16-1039:6. For example,

---

[5]PenSa Exhibit 8 contains numerous documents, and the exhibit pages are not numbered. The January 9, 2009 letter is included in these documents.

on January 25, 2008,  PenSa formally notified Bays of PenSa's election to participate in the completion of the Ethel Lou No. 1 well, and PenSa stated it had "a copy of the logs," and it was "in a position to make an informed and intelligent election."  Bays Ex. 51.

PenSa's own internal books show an outstanding obligation of $874,217 to Bays as of December 2008.  As noted, *supra,* the evidence shows that PenSa's financial condition at the time was such that it could not have satisfied this debt without seeking additional cash from outside the company.  The amounts owed have never been paid by PenSa, and the total of outstanding JIBs owed to Bays, with interest  as of May 31, 2011, is $1,572,905.09.  Trial Tr. vol. III, 467:1-468:7; Bays Exs. 282 and 284.

PenSa also contends it was not obligated to pay the JIBs because the joint account was overcharged as a result of the work performed by BOSC.  It contends that Bays breached its duty of good faith and fair dealing by utilizing the services of BOSC, an affiliated company.  PenSa contends Bays paid inflated prices to BOSC, thereby benefitting its owner, Joe Bays, to the detriment of PenSa and the other non-operators.  PenSa claims that utilizing BOSC for these services constituted a conflict of interest and a material breach of the JOAs.

The JOAs authorize Bays to utilize the services of affiliated vendors so long as the resulting charges are competitive with the prevailing rates in the area.  JOAs Art. V(C)(1), Bays Exs. 1 and 3.  The JOAs also require that charges attributable to affiliated companies must be competitive with those of non-affiliated vendors, and "the rate of such charges shall be agreed upon by the parties in writing."  JOAs Art. V(D)(1), Bays Exs. 1 and 3.  The JOAs further provide that the parties "shall be free to act on an arm's-length basis in accordance with their own respective self-interest, subject, however, to the obligation of the parties to act in good faith in their dealings with each other with

17

respect to activities hereunder."  JOAs Art. VII(A), Bays Exs. 1 and 3.

Mr. Bays testified that he determined the competitiveness of the prices charged by BOSC based on his experience in the oil and gas business and his knowledge of the prevailing prices in the areas in which the wells were located.   Other than Mr. Bays's opinion, no direct evidence of prevailing prices was presented by Bays. PenSa presented evidence from its expert witness, Robert Campbell, who testified that he contacted one person who provided tubular material similar to that provided by BOSC, and Mr. Campbell found his charges to be less than those of BOSC. Trial Tr. vol. VI, 1137:3-12.

Although it is clear that BOSC provided some benefits to the joint account, Bays did not strictly comply with the protections established by the JOAs for the use of affiliated companies. The evidence shows that BOSC marked up directional drilling services by 12 percent and tubulars by 15 percent profit margins.  Trial Tr. vol. I, 128:1-9;130:13-24; 408:7-15.   The evidence further establishes that Bays did not effectively ensure that BOSC's charges were competitive, and it did not obtain the written agreement of the non-operators in advance of work performed by BOSC.

The evidence also establishes that charges attributable to work performed by BOSC and materials it supplied were addressed in PenSa's audit of the operations for calendar years 2005, 2006, and 2007.  As noted herein, *supra,* the Auditor was asked by PenSa to review billings from related companies, including BOSC.  In the Audit Report, the Auditor criticized Bays's use of BOSC as a potential conflict of interest, but he did not identify any exceptions or issues related to expenses regarding the work performed, or materials supplied, by BOSC.  Bays Ex. 157.

The evidence establishes that Bays purchased pipe from BOSC, and used BOSC for directional drilling services. The evidence also establishes that BOSC was profitable during the time

18

period at issue.  Its tax returns show that its gross profits in 2005 were approximately $479,000.  In 2006, its gross profits were $2.30 million; in 2007, that amount was $3.02 million; its gross profits for 2009 were $3.70 million.  Trial Tr. vol. II, 347:5-22.

In addition to work performed or services provided by BOSC during the years covered by the Audit, the JIBs sent to PenSa in 2008, 2009, and 2010 reflect charges attributable to work performed or materials supplied by BOSC.  Bays Exs. 58, 59, 60.  These charges were not addressed in the Audit Report covering previous years.  Although PenSa did not request a COPAS audit for the years 2008 through 2010, it did assert its counterclaims in this case in January 2008 which, among other claims, include a request for an accounting.

PenSa also contends that Bays breached its duty of good faith and fair dealing by entering into financing arrangements with Boom Drilling and Ultimate Drilling for the furnishing of drilling rigs.  The evidence shows that Bays financed the actual construction of drilling rigs in return for securing the use of the rigs for the wells covered by the JOAs.  The evidence further shows that, during the time period at issue in the lawsuit, there was a shortage of drilling rigs in the area of Bays's operations, thereby increasing the costs of drilling in that area.  PenSa did not offer persuasive evidence to show that the arrangements with Boom Drilling or Ultimate Drilling resulted in increased costs to PenSa. To the contrary, in a February 2007 report to its Investors, PenSa stated "we are very fortunate" that Bays had made arrangements for drilling rigs, noting the rig demand in the area was very high.  Bays Ex. 5, p. 5.

PenSa also contends its failure to pay JIBs was proper because Bays repeatedly exceeded costs set out in the applicable Authorization for Expenditures ("AFEs") for the wells at issue.  The evidence shows that, although costs exceeded the estimates in the AFEs, and the costs of some wells

19

exceeded the AFE by more than $1 million, the increased costs were necessitated by a variety of problems encountered in the drilling and completion process.  The area in question has complex geology, and presents significant challenges for oil and gas drilling operations. Trial Tr. vol. VII, 1264:19-22; 1401: 20-1402:3.  As sophisticated participants in the industry, the principals of PenSa were well aware of the geological difficulties presented by the area in which the subject wells were being drilled.

There is no evidence that Bays fraudulently misrepresented the actual costs, nor is there evidence that Bays benefitted from these increased costs to the detriment of other interest owners. Moreover, the evidence shows that Bays bore its own proportionate share of these costs.  During most of the time period at issue and at least through April of 2007, Bays had a 54 percent working interest in the wells, thereby requiring that it bear that proportionate share of actual costs, regardless of the amount set out in the AFE.  Trial Tr. vol. I, 103:7-12.   For example, the Hallee Blair No. 1 was an expensive well in which Bays had a 54 percent working interest, greater than that of Pensa. As a result, Bays's expenditures on that well exceeded those attributable to PenSa.

PenSa offered expert testimony in support of its contention that Bays was grossly negligent in conducting operations, and Bays offered expert testimony in response.  PenSa's expert, Robert Campbell, offered testimony in support of PenSa's contention that Bays wrongly concluded the Bromide zone was depleted in the Anderson No. 1 well, and that Bays damaged formations as a result of its operations.  Trial Tr. vol. VI, 1105-1116; 1121–1122.   He also opined regarding what he considered excessive costs incurred in the drilling and completion of wells covered by the JOAs, as well as Bays's decisions regarding operations in the area, which he also found improper.  *Id.* at 1133-1135:5.  In Mr. Campbell's opinion, there were numerous unnecessary operations as well as

problems incurred which could have been avoided by the operator's exercise of reasonable diligence.  Trial Tr. vol. VI, 1158-1161.  He opined that Bays incurred unnecessary lease operating expenses because of excessive days spent in unproductive drilling, but he acknowledged that, as a non-operator, PenSa had the right under the JOAs to propose certain actions, including additional testing or plugging and abandoning wells.  Mr. Campbell calculated extensive money damages allegedly incurred by PenSa as a result of Bays's errors and/or gross negligence, but admitted that some of his calculations included the Golden Trend Wells, which are not at issue in this lawsuit. Trial Tr. vol. VII, 1281:6-15.  Mr. Campbell also testified the damages he calculated included the operations and expenditures covered by the 2005-2007 Audit conducted by PenSa, but he did not review the Audit Report.  Trial Tr. vol. VII, 1275: 21-25; 1276-1277.

Bays's expert witness, Dan Reineke, offered his opinion and evidence that the formations were not damaged as claimed by PenSa, and provided evidence that the costs of drilling in the area covered by the Treasure Valley and Treasure Valley North JOAs are greater than those in other areas because of the geological formations involved.  Mr. Reineke noted that directional drilling is required in the area, and that process necessarily increases costs; he described the Garvin and Murray County areas as involving the "toughest directional drilling in the state."  Trial Tr. vol. VII, 1401: 20-1402:3.  PenSa's expert, Mr. Campbell, agreed that the geology in the area in which the subject wells were drilled and operated is very complex.  Trial Tr. vol. VII, 1264:19-22.  Mr. Reineke also noted that, if a non-operator such as PenSa believed that unnecessary lease operating expenses were being incurred, as claimed by Mr. Campbell, the JOAs give the non-operator the right to propose plugging and abandoning non-producing wells.  JOAs, Art. VI(E)(2), Bays Exs. 1 and 3.

The evidence reflects that many of the actions or omissions on which Mr. Campbell's opinions were based occurred during the time period covered by the Audit Report, which he did not review.  The evidence also establishes that, although Mr. Campbell acknowledged PenSa's right to propose plugging and abandoning non-producing wells to avoid incurring additional lease operating expenses, PenSa never sought to exercise that right.  Nor does the evidence establish that PenSa at any time raised those issues with its Investers in the reports it forwarded to them.

Overall, except for certain points which have been noted, the expert testimony was polarized and contradictory.  As further discussed in the conclusions section, *infra*, the effect of the competing expert testimony of Mr. Campbell and Mr. Reineke was generally that, regarding counterclaims for which PenSa relied substantially on the testimony of Mr. Campbell, the evidence failed to preponderate in PenSa's favor.

III. Conclusions of law:

This case involves a dispute regarding the respective obligations of the parties pursuant to the JOAs.  A JOA "is a contract and shall be construed like any other contract."  *Oxley v. General Atlantic Resources, Inc.,* 936 P. 2d 943, 945 (Okla. 1997) (citing *Amarex, Inc. v. El Paso Natural Gas Co.,* 772 P.2d 905, 908 (Okla. 1987) and 2 Kuntz, *Oil and Gas Law* § 19A.6).  In Oklahoma, a breach of duties under a JOA "gives rise to a breach of contract claim, not one for breach of fiduciary duty."  *Tarrant v. Capstone Oil & Gas Co.,* 178 P.3d 866, 870-1 (Okla. Ct. App. 2007).

Pursuant to a JOA, an operator has a duty to conduct its activities "as a reasonable prudent operator, in a good and workmanlike manner."  JOAs Art. V(A).  An operator does not "have any liability as Operator to the other parties for losses sustained or liabilities incurred except such as may result from gross negligence or willful misconduct."  JOAs Art. V(A), p. 4.  This language is valid

and enforceable.  *Palace Exploration Co. v. Petroleum Development Co.,* 374 F.3d 951, 954 (10th Cir. 2004).

This case also includes claims between the parties which sound in equity.  Bays's request to foreclose its operator's liens is an equitable claim.  *See, e.g., Continental Exploration, L.L.C. v. S & S Exploration, L.P.,* No. 108,607 (Okla. Civ. App. Aug. 23, 2012) (unpublished opinion). Pensa's request for an accounting, likewise, is an equitable claim.  *See, e.g., Weber v. Mobil Oil Corp.*, 506 F.3d 1311, 1312 (10th Cir. 2007).   Accordingly, both parties have invoked the Court's equity jurisdiction.  The essence of such jurisdiction has long been recognized as the power "'to do equity and mould each decree to the necessities of the particular case.'" *Blood v. Fleming*, 161 F.2d 292, 296 (10th Cir. 1947) (quoting *Hecht Co. v. Bowles,* 321 U.S. 321, 329 (1944)).   The Court has at its disposal "all the inherent equitable powers of the District Court" for the proper and complete exercise of its jurisdiction.  *Mitchell v. Robert DeMario Jewelry, Inc.,* 361 U.S. 288, 291 (1960). Accordingly, the Court may apply flexible powers "as might be necessary to the right administration of justice between the parties."  *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308, 336 (1999).

A.  Bays's claims:

1.  Unpaid JIBs:

The evidence establishes that Bays has satisfied its burden of proof that PenSa breached the terms of the JOAs by failing to pay its share of JIBs.  Even if Bays had itself failed to strictly comply with the JOAs, the plain language of those agreements and the applicable law do not give PenSa the right to unilaterally refuse to pay its proportionate share of the operating expenses.  *See, e.g.,  Hunt Petroleum Corp. v. Mobil Oil Exploration & Producing Southeast, Inc.*, 2000 WL 98156, at *6 (E.D.

La. Jan. 27, 2000) (unpublished opinion).

PenSa had the right, under the JOAs, to request and conduct an audit.  PenSa exercised that right for calendar years 2005, 2006, and 2007.   The evidence showed that the Audit was conducted and that Bays timely responded to the Audit Report.   Ultimately, it credited PenSa with approximately $5,000.00 as a result of the Audit, and PenSa never challenged the accuracy of that credit.   Pursuant to the JOAs, "all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment." COPAS Art. I(4).   The Court concludes that, regarding challenges to the billing practices and the JIBs covered by the Audit for calendar years 2005, 2006, and 2007, the Audit results are conclusive. PenSa exercised its right under the JOAs to audit the Joint Account for these time periods, it conducted a thorough audit, Bays timely responded and gave PenSa credit for some entries, and PenSa did not challenge that result.

Bays is entitled to recover the amount owed by PenSa on its unpaid JIBs.   PenSa is entitled to an offset for the amount of unpaid JIBs in an amount equivalent to the revenues suspended by Bays and held in an escrow account for that purpose.

The Court, therefore, concludes that Plaintiff Bays is entitled to recover on its breach of contract/money damage claim the amount of its outstanding JIBs, $1,572,905.09, plus accrued and accruing interest calculated at the rates set forth in the JOAs,[6] less the revenues held in escrow, and

---

[6]Under the Treasure Valley JOA, interest is charged at the prime rate in effect at Chase Manhattan Bank of New York on the first day of the month in which delinquency occurs plus 1 percent.  Bays Ex. 3 at p. 30, COPAS Art. I(3)(B). Under the Treasure Valley North JOA, interest is charged at the prime rate in effect at Bank of Oklahoma on the first day of the month in which delinquency occurs plus 3 percent. Bays Ex. 1 at p. 35, COPAS Art. I(3)(B).

less the equitable adjustment or offset discussed, *infra*, at pages 35 through 39.

    2.  Propriety of Bays's suspension of PenSa's rights after default:

    The evidence also establishes that Bays was entitled to suspend PenSa's rights under the JOAs upon PenSa's failure to timely cure its defaults attributable to unpaid JIBs.  The JOAs state that any party failing to discharge any financial obligation under the agreement within the period required for payment may have its rights suspended if it fails to cure the defaults identified in a Notice of Default:

> Any party may deliver to the party in default a Notice of Default, which shall specify the default, specify the action to be taken to cure the default, and specify that failure to take such action will result in the exercise of one or more of the remedies provided in this Article.  If the default is not cured within thirty (30) days of the delivery of such Notice of Default, all of the rights of the defaulting party granted by this agreement may upon notice be suspended until the default is cured, . . .  The rights of the defaulting party that may be suspended hereunder at the election of the non-defaulting parties include, without limitation, the right to receive information as to any operation conducted hereunder during the period of such default, the right to elect to participate in an operation proposed under Article VI(B) of this agreement, the right to participate in an operation being conducted under this agreement even if the party has previously elected to participate in such operation, and the right to receive proceeds of production from any well subject to this agreement.

JOAs, Art. VII(D)(1) at pp. 12-13.

    On December 1, 2008, well after PenSa's JIBs remained unpaid for a period exceeding 90 days, and in accordance with the terms of the Treasure Valley JOA, Bays  delivered to PenSa Notices of Default for several wells in the Treasure Valley contract area.  As required by the Treasure Valley JOA, these December 2008 (and later) Notices of Default specified the default for each well, and explained the action PenSa should take to cure the default.  The Notices of Default also expressly specified that PenSa's failure to cure the default within 30 days would result in Bays's exercise of one or more of the remedies provided in the JOA.  PenSa  Ex. 8 at pp. 38-43, 47-65.

These Notices of Default were based on unpaid JIBs for the Hallee Blair No. 1-R, El Ray No. 1-36, Tammy No. 1, Konlee Jae No. 1, Donna Sue No. 1, and the Ethel Lou No.1 wells.

On or about May 12, 2009, Bays delivered to PenSa a Notice of Default for the Laticia Lee No. 1, the only well in the Treasure Valley North contract area in which PenSa held an interest.  As required by the Treasure Valley North JOA, this Notice of Default specified the default for the well and the action PenSa should take to cure the default.  The Notice of Default also expressly stated that PenSa's failure to cure the default within 30 days would result in Bays's exercise of one or more of the remedies provided in the Treasure Valley North JOA.

PenSa acknowledges that all Notices of Default issued by Bays to PenSa on and after December 1, 2008 are in the proper form required by the JOAs.  PenSa further admits that it has not paid any of the amounts identified in those Notices of Default, nor has it otherwise taken any action to cure its default status.

When PenSa failed to cure its default within 30 days as required by the JOAs, Bays was entitled to suspend all of PenSa's rights arising out of or relating to any of the wells covered by the applicable operating agreements. JOAs Art. VII(D) at pp. 12-13.[7]  Commencing on February 12, 2009,  after the applicable 30-day cure period had expired, Bays provided PenSa with Notices of Suspension of Rights for each of the wells in which PenSa held an interest and had failed to cure its default.  PenSa admits that each notice is in the proper form required by the JOAs.

Pursuant to the express terms of the JOAs, each party to the JOA grants to other parties a lien

---

[7]To the extent PenSa asserts that periodic suspension of its rights by Bays prior to the time when technically correct notices of default were issued constituted material breaches by Bays excusing PenSa's subsequent performance, such assertions are without merit.  The evidence establishes that PenSa was aware that it could cure such purported defaults within 30 days, and normally did so during that period.  Moreover, these sporadic purported defaults did not result in an attempt by Bays to assert operator's liens.  In any event, this conduct by Bays cannot reasonably be considered material breaches of the JOAs. *See, e.g., Restatement (Second) of Contracts* §241 (1981).

upon "any interest it now owns or hereafter acquires" in the "Contract Area," which constitutes the entire area covered by the JOA, and such interests include "leasehold interests, working interests, operating rights, and royalty and overriding royalty interests." JOAs, Bays Exs. 1 and 3, Art. VII (B). The JOAs further provide remedies to the non-defaulting parties where a party "fails to discharge any financial obligation" thereunder. *Id.* at Art. VII(D). Among the express remedies provided is the suspension of rights imposed after submission of a Notice of Default and failure to cure the default. *Id.* at Art. VII (D)(1). That provision, quoted in its entirety, *supra,* expressly authorized Bays, as the non-defaulting party, to suspend PenSa's rights during the period of default. The rights to be suspended include, "without limitation," the right to receive information as to any operation conducted during the period of default, the right to elect to participate in operations, and "the right to receive proceeds of production from any well subject to this agreement." *Id.* The JOAs thus entitle non-defaulting parties to suspend the rights of a defaulting party as to all of the defaulting party's interests in the "Contract Area" covered by the JOA. JOAs, Art. VII (B) and VII (D)(1).

PenSa's failure to cure the defaults identified in the Notices of Default issued on and after December 1, 2008 thus triggered the Suspension of Rights provision and entitled Bays to suspend PenSa's rights in all wells in the contract areas covered by the Treasure Valley and Treasure Valley North JOAs.

The Court concludes that Bays properly suspended all of PenSa's rights, including the right to receive any revenue from production proceeds for any well under the Treasure Valley and Treasure Valley North JOAs in which PenSa claimed an interest.

3.  Foreclosure of operator's liens:

Pursuant to express language of each JOA, Bays also has a valid Operator's Lien in an amount equal to the total amounts that PenSa is in default due to the non-payment of its JIBs. *See* Art.

VII(B) at p. 12 of the JOAs, Bays Exs. 1 and 3.

In Oklahoma, liens may be created by contract.  42 Okla. Stat. § 6.  Oklahoma courts have expressly recognized that "[t]he A.A.P.L Model Form Operating Agreements provide the operator with a contractual lien against the interest of the non-operator."  *Amarex, Inc. v. El Paso Natural Gas Co.*, 772 P.2d 905, 908 (Okla. 1987).

An operator's lien is an enforceable security interest that grants the lienholder the right to foreclose on any of the collateral specified in the security agreement:

> The operator's lien is an enforceable security interest. The lienholder has the right to foreclose on any of the collateral specified in the security agreement. As long as the operating agreement expressly authorizes foreclosure, or the use of any other remedy at law or equity, against any or all of the collateral without limiting or prescribing the exercise of such rights, the operator may foreclose on any portion of the collateral.

Gary B. Conine, *Property Provisions of the Operating Agreement – Interpretation, Validity, and Enforceability*, 19 Tex. Tech. L. Rev. 1263, 1303-04 (1988) (citing *Andreau v. Michigan Wisconsin Pipeline Co.*, 712 P.2d 372 (Wyo. 1986)).

Where, as in this case, the JOAs expressly authorize foreclosure, or the use of any other remedy at law or equity, against any or all of the collateral, the operator may thus foreclose on any portion of the collateral.  *Id.*  In *Andreau*,  the defaulting non-operator was due a credit because of an imbalance in the sales of its proportionate share of the production. *Andreau*, 712 P.2d at 374.  The non-operator contended that the operator had a duty to offset the undisputed debts owed first against the credit due to this gas account before proceeding to sell any portion of the non-operator's working interest to satisfy the debt.  *Id.*  Rejecting this argument, the Wyoming Supreme Court held:

> [Non-operator] cites no authority, and this court has found none, which supports the proposition that an operator holding a valid lien upon a nonoperator's entire working interest cannot foreclose that lien, but must instead foreclose only upon the production obtained from the working interest. No court, to our knowledge, has ever imposed this

duty. Even more important in this case, however, is the operating agreement which expressly negates such a duty.

*Id.*

Pursuant to the unambiguous terms of the JOAs in this case, Bays may foreclose on any or all wells covered by the applicable JOA when, as here, PenSa is in default for failure to pay its JIBs on any wells that are covered by that JOA.  Accordingly,  Bays is entitled to foreclose its operator's liens against PenSa's interests in all properties covered by the Treasure Valley and Treasure Valley North JOAs.

B. PenSa's counterclaims:

1.  Alleged material breaches of operating agreements:

PenSa asserts numerous allegations in support of its contention that Bays  materially breached the JOAs.  Because many of these allegations are  related, the Court has determined its conclusions are best presented without attempting to delineate specific allegations.   Accordingly, the Court concludes as set forth in the following discussion.

With respect to PenSa's counterclaim based on the contention that Bays did not timely provide information which an operator is required to furnish to a non-operator, the Court finds Pensa has not met its burden of proof on this claim.  The evidence was conflicting as to whether PenSa was provided with required information.  Although Bays periodically suspended the flow of information –perhaps technically contrary to the JOA–it is undisputed that PenSa was consistently in default of its payment obligations.   Moreover, the evidence shows that PenSa indicated that, with respect to its decision whether to participate in certain well completions, it had sufficient information to make an informed decision.  Furthermore, there was evidence showing that PenSa forwarded information on to its Investors with respect to decisions regarding well information, and the recommendations

made by PenSa to its Investors reflect that it had detailed information.  The evidence presented simply does not preponderate to show a material breach by Bays in this regard.

Concerning PenSa's contention that it did not receive timely billing information, the testimony established that Bays's accounting and billing practices, while perhaps not perfect, did meet minimally sufficient industry standards.  As indicated, PenSa was consistently in default with regard to timely payment of its JIB obligations.  Although the evidence established that PenSa initially cured the defaults, it also established PenSa  did not do so after the December 2008 default letters were sent to it by Bays.  PenSa eventually stated it would no longer pay JIBs.  The evidence established that, during the time period in question, PenSa was on the brink of insolvency or actually insolvent. Any deficiencies in Bays's billing and accounting practices were not sufficient to constitute a material breach of the JOAs.   Furthermore, the COPAS audit covered three years of the parties' business relationship, calendar years 2005 through 2007, and it revealed only minor discrepancies.

With respect to PenSa's contention that Bays breached the operating agreement by consistently exceeding AFEs for the wells in question, it has long been recognized that AFEs represented only cost estimates.  *See, e.g., Cleverock Energy Corp. v. Trepel*, 609 F.2d 1358, 1360 (10th Cir. 1979).   The general rule is that a non-operator is obligated to pay its proportionate share of costs of initial drilling, even if they exceed the costs set out in the AFE.  *M&T, Inc. v. Fuel Resources Development Co.*, 518 F. Supp. 285, 291 (D. Colo. 1981).  Although the evidence in this case reflected cost overruns, it also confirmed that the area of Bays's operations presented significant geological challenges – a reality of which PenSa was no doubt aware.  PenSa did not present evidence sufficient to establish a material breach on this basis.

Nor did the evidence support PenSa's contention that Bays breached the operating agreements by continually submitting untimely revenue payments in violation of Oklahoma law, the Production

Revenue Standards Act, Okla. Stat. tit. 52 § 570.1, *et seq.*  The statute provides in pertinent part that proceeds from the sale of oil and gas production must be paid to persons legally entitled thereto within a prescribed time period.  The statutory deadline is triggered by the month in which production is actually sold rather than when it is produced.  Okla. Stat. tit. 52 § 570.10(B)(1)(b).  PenSa's expert witness, John Reeves, admitted that the payment period could be as long as ninety days from the date the production is sold and still comply with the statute.  Trial Tr. vol. VII, 1367:1-16.  Lou Pendleton of PenSa prepared an exhibit, PenSa Ex. 66, designed to show delayed payments; however, Mr. Pendleton admitted that he could not confirm that the receipt stamps reflected therein were accurate.  Trial Tr. vol. IV, 695:6-14.  The exhibit also identifies only the production month for each revenue statement, and does not identify the month in which production was actually sold.  Mr. Reeves also candidly testified that the dates shown on the exhibit were inaccurate because the revenue receipt date was based on the date on which the check was deposited, rather than the date on which it was received.  Trial Tr. vol. VII, 1351:8-25; 1352: 1-3.  There was also conflicting testimony regarding the time of receipt as indicated by a stamp utilized by PenSa to record the date on which a check was received.

The inconsistent evidence regarding the alleged untimely payment of revenues to PenSa is insufficient to satisfy PenSa's burden of proving by a preponderance of the evidence that Bays breached the JOAs by failing to timely distribute revenue.

2.  PenSa's counterclaim asserting gross negligence:

With respect to PenSa's counterclaim based on the allegation that Bays was grossly negligent in its operation of the wells, "[g]ross negligence is the intentional failure to perform a manifest duty in reckless disregard of the consequences or in callous indifference to the life, liberty or property of another which may result in such a gross want of care for the rights of others and the public that a

finding of a willful, wanton, deliberate act is justified." *Palace Exploration Co. v. Petroleum Development Co.,* 374 F.3d 951, 954 (10th Cir. 2004); *Martin v. A.C.G., Inc.,* 965 P.2d 995, 997 (Okla. Civ. App. 1998). To establish this claim, PenSa must offer evidence to show that Bays intentionally failed to perform its duty in a manner that reflects "actual subjective knowledge of an extreme risk of serious harm." *IP Petroleum Company, Inc. v. Wevanco Energy, L.L.C.,* 116 S.W. 3d 888, 897 (Tex. Civ. App. 2003).

PenSa has not satisfied this burden. There was conflicting evidence regarding whether Bays's operations harmed the wells, and there was no evidence that could satisfy a requirement that it did so intentionally or with such reckless disregard that the Court could find its conduct willful or wanton. There was extensive testimony, through expert witnesses and fact witnesses for both parties, regarding the operations performed by Bays. In the Court's view, however, the more persuasive testimony was provided by Bays's expert witness, Dan Reineke. While the evidence shows that Bays's decisions were not perfect, the evidence does not support a finding that it was grossly negligent or that it engaged in willful misconduct. With respect to PenSa's contention that Bays's negligence damaged the Bromide formation, there was also conflicting opinions expressed by the parties' respective expert witnesses as to whether the damage actually occurred. Even if some damage resulted, however, the evidence is not sufficient to show that Bays's actions constituted gross negligence. Accordingly, PenSa is not entitled to recover on its counterclaim contentions based on a theory of gross negligence or willful misconduct.

3. PenSa's counterclaim seeking removal of Bays as operator:

The JOAs contain provisions whereby non-operators may seek removal of the operator. The JOAs provide a specific procedure for removal which requires, *inter alia,* delivery of written notice to the operator by a non-operator "detailing [the] alleged default." JOAs Art. V(B)((1). If written

notice is given, the operator has 30 days in which to cure the default.  *Id.*  In any event, removal of the operator requires a showing of "good cause," which is defined by the JOAs as "not only gross negligence or willful misconduct but also the material breach of or inability to meet the standards of operation...or material failure or inability to perform its obligations."  *Id.*

PenSa has not provided evidence that it satisfied the written notice obligation under the JOAs. Its trial testimony suggested that it believed the January 9, 2009 letter, PenSa Ex. 8, satisfied this obligation. The Court disagrees.  Even if the letter were considered sufficient notice, however, PenSa has not presented sufficient evidence to satisfy the "good cause" standard required by the JOAs to warrant removal of Bays as operator.

As the Court has concluded, *supra,* PenSa has failed to satisfy its burden of proof that Bays was grossly negligent or engaged in willful misconduct.  The Court has also concluded that PenSa has failed to satisfy its burden of proving Bays materially breached the JOAs.  Accordingly, good cause has not been established so as to allow for removal of Bays as operator.

Nor can PenSa satisfy the alternative requirement that Bays no longer owns an interest in the contract area.  PenSa contends that Bays no longer owns an interest because it conveyed its interests to Bays Energy Partners.  The evidence shows that, contrary to PenSa's contention, Bays retained an interest in the subject areas because it reserved to itself the Woodford formation from each assignment made to Bays Energy; furthermore, the conveyance was to an affiliated limited partnership.  Under the JOAs, a change of corporate name or structure or transfer of interest to a subsidiary, parent or successor corporation "shall not be the basis for removal of Operator."  JOAs Art. V(B)(1).

PenSa has not presented evidence sufficient to satisfy its burden of proof warranting removal of Bays as operator of the wells at issue under the terms of the JOAs.  Accordingly, its counterclaim

fails.

4. PenSa's counterclaim for slander of title:

PenSa has also asserted a counterclaim for slander of title based on Bays's filing of operator's liens. To prevail on a claim of slander of title under Oklahoma law, PenSa must prove: 1) publication of a statement; 2) the published statement was false; 3) the publication was maliciously made; 4) the publication caused PenSa to incur special damages resulting therefrom;  and 5) PenSa  owns or possesses an interest in the subject property. *Zehner v. Post Oak Oil Co.*, 640 P.2d 991, 994 (Okla. Civ. App. 1981) (citing *New England Oil & Pipe Line Co. v. Rogers*, 7 P.2d 638 (Okla. 1932)).

PenSa has not sustained its burden of proving these elements.  Assuming the filing of an operator's lien constitutes the "statement" required to support this cause of action, there is no evidence that the operator's liens filed by Bays contained false information or that Bays acted maliciously in filing the liens.  The liens were created by the express terms of the JOAs between the parties, and the JOAs create an enforceable lien right under Oklahoma law. *Amarex,*  772 P.2d at 908.   As discussed, *supra*, PenSa's expert witness, John Reeves, an experienced and highly competent oil and gas lawyer, acknowledged that the JOAs create an operator's lien, and the liens at issue were properly perfected under the JOAs and Oklahoma law. There is no evidence that the liens contained false or inaccurate information, nor is there any evidence on which the Court could base a conclusion that Bays acted maliciously in filing the liens.

There is also no evidence from which the Court could conclude that PenSa has suffered damages as a result of the alleged publication.  The filing of the lien statements does not deprive PenSa of its interests, and the lien statements provide only notice of the claim referenced therein. *Mobile Components, Inc. v. Layon*, 623 P.2d 591, 594 (Okla. 1980).  Accordingly, lien statements do not constitute a significant infringement on the property owner's right to use and enjoy the

34

property.  *Id.*

In this case, PenSa has failed to present evidence sufficient to sustain its burden of proof on its slander of title counterclaim, and relief is denied.

5.  PenSa's request for an accounting:

An action for a common law accounting  "contemplates a full and complete investigation of the mutual acts of the parties and the striking of a balance and rendition of judgment in favor of the party entitled thereto."  *Mills v. Mills*, 512 P.2d 143, 149-50 (Okla. 1973).   The essentials of equitable jurisdiction in such an action are described as the need for discovery, the complicated character of the accounts, or the existence of a fiduciary or trust relation.  *Vilbig Construction Co. v. Whitham*, 201 P.2d 922, 925 (Okla. 1949).  Although Oklahoma law suggests that courts should not invoke equitable powers when an adequate legal remedy is available, *see Tillman ex. rel. Estate of Tillman v. Camelot Music, Inc.,* 408 F.3d 1300, 1309 (10th Cir. 2005), the Court has the authority to exercise such powers when the parties have requested equitable remedies.   As discussed herein, *supra* at page 23, the Court may exercise its equitable power to fashion remedies appropriate to "the necessities of the particular case." *Blood,* 161 F.2d at 296.  The Court has the discretion to exercise flexible equitable powers  "as might be necessary to the right administration of justice between the parties." *Grupo Mexicano de Desarollo, S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308, 336 (1999). "[E]quitable remedies are a special blend of what is necessary, what is fair, and what is workable...In equity, as nowhere else, courts eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests...." *Lemon v. Kurtzman,* 411 U.S. 192, 200 (1973).

The Court concludes that, in order to achieve a fair and equitable result in this dispute, PenSa should be awarded limited relief in connection with its accounting claim regarding  the charges

attributable to work performed and materials supplied by BOSC during a specified time period. PenSa is not entitled to relief regarding the charges attributable to BOSC or any other matters reflected in the JIBs or related to the operations of Bays for the time period covered by the Audit for the calendar years 2005, 2006 and 2007.   The Court finds no evidence sufficient to support PenSa's request for an accounting of all charges and issues related to the operation of the wells for the calendar years covered by the previous Audit.   The Court finds, however, that the issue of the propriety of charges attributable to work performed and services provided by BOSC during the period after the Audit requires a flexible approach so as to adapt a particular remedy to effect complete justice between the parties with respect to the BOSC charges.

Rule 53 of the Federal Rules of Civil Procedure permits the appointment of a special master to perform certain tasks, including an equitable accounting. *See* Fed. R. Civ. P. 53(a)(1)(B)(ii). However, "matters of account are not to be sent routinely to a master," and the Court should not appoint a master if the accounting is not overly complicated.  9C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2605 (3d ed. 2008).   Referral to a special master is subject to a "restrictive policy" in part because of the resulting expense and delay.  *Id.*   Accordingly, where the Court has sufficient evidence and the matters involved are not particularly complex, a special master should not be appointed.  *See, e.g., S.E.C. v. W Financial Group, LLC*, 2009 WL 636540, at *1 n. 1 (N.D. Tex. Mar. 9, 2009) (unpublished opinion); *Hanover Ins. Co. v. Emmaus Municipal Authority*, 38 F.R.D. 470, 473 (E.D. Pa. 1965).

In this case, referral to a special master is inappropriate because the record contains sufficient evidence to allow the Court to review the BOSC charges during the post-Audit time period and determine the amount of those charges attributable to PenSa's proportional interests.   The evidence is not overly complex and consists of information reflected on specific JIBs.   Accordingly, the Court

will proceed to determine whether PenSa is entitled to any credit or offset for charges attributable to the work performed or the services provided by BOSC subsequent to the time period after the Audit.

PenSa does not dispute that Bays was authorized by the JOAs to engage affiliated companies, including BOSC, to perform work and provide services. JOAs, Bays Exs. 1 and 3, Art. V(D)(1). However, the JOAs expressly require that the cost of work performed by "affiliates or related parties of Operator shall be performed or supplied at competitive rates, pursuant to written agreement, and in accordance with customs and standards prevailing in the industry." *Id.* Bays did not present evidence sufficient to show the prevailing rates charged by other companies for the work performed or the materials supplied by BOSC.

A review of the Operating Statements for calendar years 2008, 2009, 2010, and January-May of 2011 reflects that BOSC performed work or provided services in 2008, 2009 and 2010. Bays Exs. 58, 59, 60. The charges attributable to BOSC were included in the JIBs submitted to PenSa and are reflected in the unpaid charges which Bays seeks to recover. The Operating Statements for 2011, submitted as Bays Ex. 61, reflect no work performed, or services provided, by BOSC. The Court concludes that, given the absence of evidence regarding the prevailing rates charged by other companies providing the same services or performing the same work as BOSC in the area, PenSa is entitled to limited relief in connection with its accounting claim regarding the charges attributable to BOSC for calendar years 2008, 2009, and 2010 only.

The Court acknowledges Bays's argument that PenSa never sought an audit of these charges despite its right to do so under the JOAs. The Court also acknowledges that, during the Audit performed for previous years, the Auditor was expressly asked to review BOSC's work and services, and no exceptions were noted, nor did PenSa raise that issue in communications with Bays. The Court also recognizes that, under COPAS, charges not challenged in writing by the non-operator

within 24 months are presumed accurate.  COPAS Art. (I)(4).  However, PenSa did seek relief in the

form of an accounting in its counterclaims asserted in January 2008, and the Court concludes that this

constitutes sufficient written exception as required by COPAS, and conveys sufficient notice of

PenSa's disagreement with Bays's JIBs for the post-Audit period.  Because the counterclaim was

asserted within 24 months of the charges incurred in the post-Audit period, the COPAS presumption

of accuracy provision is not triggered.

The Court has reviewed the BOSC charges reflected in the JIBs for the period 2008 through

2010.  The evidence establishes BOSC applied a 12 percent profit mark-up for directional drilling

services and a 15 percent profit mark-up for tubular material.  However, with respect to some BOSC

entries in the JIBs, it is difficult to discern which of these profit margins would have been applied by

BOSC in connection with the invoice description listed.  Therefore, the Court has applied a 15

percent across-the-board reduction of all BOSC charges for the pertinent time period.  This results

in an equitable offset in favor of PenSa in the amount of $48,493.51.

The Court's conclusion in this regard would be the same under application of the substantial

performance doctrine as recognized by Oklahoma law.  As set forth *supra*, the Court has determined

that Bays's use of its affiliate, BOSC – although not prohibited by the JOAs – was not technically

in compliance with applicable JOA provisions.  Oklahoma law recognizes not only that such

immaterial breaches do not preclude recovery on the contract, but also allows for deductions in a

plaintiff's recovery reflecting costs incurred by a defendant because of such defective performance.

*See Collins v. Baldwin*, 405 P.2d 74, 81 (Okla. 1965); *Hildago Properties, Inc. v. Wachovia

Mortgage Co.*, 617 F.2d 196, 200 (10th Cir. 1980) (applying Oklahoma law).

Thus, whether viewed as a recovery in connection with its accounting counterclaim, or as an

offset to Bays's recovery for unpaid JIBs pursuant to the JOAs, PenSa is entitled to a credit in the

amount of $48,493.51.

IV.  Judgment:

In accordance with the foregoing, judgment is hereby entered in favor of Bays and Bays Energy on their  claim for payment by PenSa of unpaid joint interest billings in the amount of $1,572,905.09, said amount to be reduced by the amount of revenues held in suspense on behalf of PenSa in the escrow account established by Bays for that purpose at Bank of Oklahoma, N. A., and by the credit or offset of $48,493.51 determined by the Court's ruling on PenSa's accounting counterclaim, as set forth below.

Judgment is also entered in favor of Bays and Bays Energy on their request for a declaratory judgment that, following the failure of PenSa to timely cure its defaults under the JOAs by failing to pay amounts due and owing on joint interest billings, Bays was entitled to suspend PenSa's rights in all of PenSa's interests covered by the JOAs.  Bays properly followed the procedures in the JOAs for the suspension of rights following PenSa's failure to cure the defaults, and such rights were properly suspended.

Judgment is also entered in favor of Bays and Bays Energy on their claim seeking a declaratory judgment that the operator's liens authorized by the JOAs were properly perfected and that they are entitled to foreclose the operator's liens granted in their favor pursuant to the JOAs as to all interests of PenSa in the properties covered by the JOAs.

Judgment is entered in favor of Bays and Bays Energy and against PenSa on all counterclaims asserted by PenSa in this action, except PenSa's counterclaim seeking an accounting.  PenSa's request for an accounting is granted in part to the limited extent that it is entitled to a credit or offset

in connection with charges attributable to work performed, or services provided, by Bays's affiliate, BOSC, during the time period of 2008 through 2010. Partial judgment is entered in favor of PenSa and against Bays and Bays Energy to the extent the Court has found BOSC's charges during this period should be reduced, resulting in a credit or offset in favor of PenSa in the amount of $48,493.51, said amount to be credited or offset against the judgment of Bays and Bays Energy for unpaid joint interest billings owed by PenSa. The Court's previous summary judgment rulings regarding certain of PenSa's counterclaims (*see* footnote 1, *supra*) are incorporated herein by reference.

IT IS SO ORDERED this 18th day of September, 2012.

TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE